**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLE SPECTOR,

*Plaintiff,*

v.                                                    Case No. 1:17-cv-001884 (EGS)

THE DISTRICT OF COLUMBIA,

*Defendant.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

I.      SUMMARY OF FACTS...................................................**Error! Bookmark not defined.**

II.     LEGAL STANDARD .......................................................**Error! Bookmark not defined.**

III.    DISCUSSION ...................................................................**Error! Bookmark not defined.**

   A.    **The Record Supports a Reasonable Conclusion that Defendant Violated the ADA by Failing to Engage in the Interactive Process and Creating an Unreasonable Delay. Error! Bookmark not defined.**

      1.    Defendant Failed to Engage in the Interactive Process in Good Faith. ............... **Error! Bookmark not defined.**

      2.    Defendant Unreasonably Delayed Plaintiff a Reasonable Accommodation to Which she was Entitled, in Violation of the ADA. .................**Error! Bookmark not defined.**

   B.    **A Reasonable Jury Could Find that Defendant Retaliated Against Plaintiff.. Error! Bookmark not defined.**

      1.    Defendant Committed an Adverse Action...................**Error! Bookmark not defined.**

      2.    Plaintiff Satisfies the Requisite Causal Connection. ...**Error! Bookmark not defined.**

   C.    **Plaintiff is Entitled to a Jury Trial on Her Retaliatory Hostile Work Environment Claim.** ............................................................................**Error! Bookmark not defined.**

   D.    **Defendant Violated Plaintiff's Statutory Rights Under The FMLA** ............... **Error! Bookmark not defined.**

      1.    FMLA Interference.....................................................**Error! Bookmark not defined.**

      2.    FMLA Retaliation.......................................................**Error! Bookmark not defined.**

IV.     CONCLUSION.................................................................**Error! Bookmark not defined.**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NICOLE SPECTOR,<br><br>   *Plaintiff,*<br><br>v.<br><br>THE DISTRICT OF COLUMBIA,<br><br>   *Defendant.* | Case No. 1:17-cv-001884 (EGS) |

## <u>TABLE OF AUTHORITIES</u>

## Cases

*Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998) ........................................ 11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................... 7

*Buie v. Berrien*, 85 F. Supp. 3d 161(D.D.C. 2015) ........................................................................ 14

*Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994) ................................................................................. 15

*Coulibaly v. Tillerson*, 273 F. Supp. 3d 16 (D.D.C. 2017) ........................................................... 31

*Doak v. Johnson*, 798 F.3d 1096,(D.C. Cir. 2015) .................................................................. 15,22

*EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789(7th Cir. 2005)........................................................ 9

*Elzeneiny v. D.C.*, 195 F. Supp. 3d 207 (D.D.C. 2016) ............................................................... 29

*Faison v. Vance-Cooks*, 896 F. Supp. 2d at 62 ............................................................................ 13

*Gordon v. District of Columbia*, 605 F.Supp.2d 239 (D.D.C. 2009)............................................. 7

*Gordon v. U.S. Capitol Police*, 778 F.3d 158 (D.C. Cir. 2015)................................................... 31

*Graffius v. Shinseki*, 672 F. Supp. 2d 119 (D.D.C. 2009).............................................................. 7

*Holcomb v. Powell*, 433 F.3d 889, 902 (D.C.Cir.2006) .............................................................. 23

*Matos v. DeVos*, 317 F. Supp. 3d 489(D.D.C. 2018)....................................................... 10,14, 17

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .......................................................... 31

*McNair v. D.C.*, 11 F. Supp. 3d 10 (D.D.C. 2014) ....................................................................... 13

*Mogenhan v. Napolitano*, 613 F.3d 1162 (D.C. Cir. 2010) ........................................................... 9

*Pantazes v. Jackson*, 366 F.Supp.2d 57 (D.D.C.2005) ........................................................ 11, 12

*Pauling v. D.C.*, 286 F. Supp. 3d 179 (D.D.C. 2017) .................................................. 10

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) ...................................... 28

*Reed v. Buckeye Fire Equip.*, 241 Fed.Appx. 917(4th Cir.2007) ................................. 30

*Roseboro v. Billington*, 606 F. Supp. 2d 104, 107 (D.D.C. 2009)...............................29-30,32-33

*Rush v. Fed. Nat'l Mortg. Ass'n*, 208 F. Supp. 3d 1, 8 (D.D.C. 2016), *aff'd,* 707 F. App'x 9 (D.C. Cir. 2017). ...................................................................................................................... 7

*Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) ...................................................... 9

*Taylor v. Rice*, 451 F.3d 898, 908 (D.C. Cir. 2006) .................................................... 14

*Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009)................................................ 23

*Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) .................................................. 9

## Statutes

29 U.S.C. § 2617(a)(1)(A)(i)(I)-(II), (B) ....................................................................... 29

29 U.S.C. § 2617(a)(3)..................................................................................................... 29

42 U.S.C. § 12112(b)(5)(A) ............................................................................................ 8

## Other Authorities

EEOC Enforcement Guidance on Reasonable Accommodation ¶ 32, http://www.eeoc. gov/policy/docs/accommodation.html. ...................................................................... 13

http://www.eeoc.gov/facts/telework.html; cf. EEOC, Employer Best Practices for Workers with Caregiving Responsibilities, http://www.eeoc.gov/policy/docs/caregiver-best-practices.html (Jan. 19, 2011)........................................................................................................... 11

*The Social Security Administration's Telework Program and its Effect on Customer Service*, No. A-04-17-50267 (July 2017), available at https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-04-17-50267.pdf.................................................................................................................. 16

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLE SPECTOR,

　　　　　　*Plaintiff,*

v.                                           Case No. 1:17-cv-001884 (EGS)

THE DISTRICT OF COLUMBIA,

　　　　　　*Defendant.*

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Nicole (Appleman) Spector ("Ms. Spector" or "Plaintiff"), by and through undersigned counsel, submits this Memorandum of Points and Authorities in opposition to the Motion for Summary Judgment filed by Defendant, the District of Columbia ("the District" or "Defendant") on October 22, 2018. Plaintiff filed an Amended Complaint containing six Counts of discrimination under various legal theories.[1] With the filing of this opposition brief, Plaintiff gives notice that she is no longer pursuing the following claim: Count II—Violation of Title VII-Sex Discrimination.[2]

## I.　　SUMMARY OF FACTS

Plaintiff was employed by Defendant as a Medical Liaison Officer in the Social Security Disability Determination Division ("DDD") of the District of Columbia Department on Disability Services ("DDS"), which is the District's local agency for processing Social Security disability claims. DDD is responsible for Social Security Disability Insurance Determinations

---

[1] Count V is listed twice, but reflects two different theories of discrimination under the FMLA. Plaintiff addresses both under Section III. D. below.
[2] Plaintiff will prepare a motion to dismiss this claim, and file with the Court.

and operates under the direction of the Federal Social Security Administration ("SSA"). DDS is

fully funded by the Federal government. Disability Determination Process, Social Security

Administration, https://www.ssa.gov/disability/determination.htm (last visited November 15,

2018).

Plaintiff was a highly-valued employee who received favorable performance reviews

while employed by DDD. She was the highest performer in her office. Pl.'s Dep. 98:10-11. In

August of 2014, Plaintiff was diagnosed with myasthenia gravis, Pl.'s Dep. 114:18-19, a

neuromuscular disorder which causes weakness and fatigue. After attempting various

unsuccessful medical treatments, medications and surgeries, Plaintiff's doctors determined that

her condition required an accommodation to her working conditions. Pl.'s Dep. 114:19-115:5;

Pl.'s Dep. 114:19-115:5. According to Plaintiff's doctors, Plaintiff would have the best chance of

stabilizing her condition if granted the ability to telework two to three days per week.  Pl.'s Dep.

117:8-16. See also Exhibit 2, (March 4, 2016 correspondence from Dr. Kaminski; March 7, 2016

correspondence from Dr. Nayar).

Plaintiff's job duties involved reviewing electronic records on a secure SSA database.

Sometime before March 2016, Plaintiff began speaking with her supervisor, Darryl Evans, about

whether it would be possible for her to access SSA's database remotely, in order to telework.

Mr. Evans responded that he was certain that it would not be a problem for Plaintiff to access

SSA's network remotely. Pl.'s Dep. 106: 3-8.  On March 7, 2016, when Mr. Evans still had not

arranged for Plaintiff to telework, Plaintiff submitted a formal, written request for an

accommodation, using a form supplied by Defendant. Pl.'s Dep. 112:13-19. Along with her

request, Plaintiff submitted doctor's letters from two different physicians:  Dr. Shakti Nayar,

Plaintiff's treating physician, and Dr. Henry Kaminski, a neurologist with George Washington

Medical Faculty Associates, from whom Plaintiff requested and obtained a second opinion. Both doctors' letters described Plaintiff's condition and stated that teleworking would best accommodate it. Dr. Nayar's letter provided her contact information and invited Defendant to contact her for further information.

Defendant denied Plaintiff's request to telework as an accommodation, without engaging in an interactive process, less than 48 hours later after receiving it. By letter dated March 9, 2016, signed by Gria Hernandez, Defendant's Human Capital Administrator, stated that DDS was denying Plaintiff's request "due to insufficient documentation to prove that [her] health condition deem[ed] [her] unable to work in an office environment." Def's Ex. 4 at 2. Plaintiff responded to Defendant's letter by email dated March 11, 2016. She asked whether Defendant had contacted either of her doctors to obtain any additional documentation it deemed necessary, as her doctors had provided Defendant their contact information and encouraged such communication, and asked "What specific information [Defendant] need[ed] provided by [her] neurologist." On March 14, 2016, her counsel sent Defendant a letter stating that its summary denial of her request violated her rights under the ADA and requested reconsideration of its decision. Def's Ex. 4 at 3.

Defendant responded to counsel's March 14 correspondence by letter dated March 17, 2016. This time, Defendant denied Plaintiff's request based on her "duties and responsibilities as according to [her] job description." Def's Ex. 4. At 5. The March 17, 2016 denial letter stated further that according to Plaintiff's position description, her job required her to be present "in the field daily to conduct annual onsite reviews[.]". *Id*. Defendant later stated on March 31, 2016 stated Plaintiff "would not be able to fulfill the[] essential job duties of daily work in the field by

working from home." Def's Ex. 4.  at 11. However, Plaintiff's job description made no mention of daily field work.

On March 24, 2016, Plaintiff filed a charge before the EEOC, alleging that Defendant discriminated against her on the basis of her disability and gender.  In addition, Plaintiff's counsel sent Defendant a letter on April 5, 2016 reiterating Plaintiff's request for telework, stating that Defendant failed to engage in an interactive process, and denied Plaintiff a reasonable accommodation on the basis of an inaccurate job description.

On April 6, 2016, Plaintiff overheard Deborah Bonsack, DDS Deputy Director for Administration and head of its human resources office at the time, discussing Plaintiff's medical condition and belittling Plaintiff to Mr. Evans. Ms. Bonsack made light of Plaintiff's request for an accommodation pointing out that DDS "gets a complaint from [Plaintiff] once a year[,]" and questioned Plaintiff's representations about her disability, asking Mr. Evans how she can do her job if fatigue is such an issue for her.

On April 6 and 7, 2016, Plaintiff provided Defendant with letters from Dr. Kaminski and Dr. Nayar explaining her disability in greater detail and why the ability to telework part-time would accommodate it. On April 11, 2016, Defendant convened a meeting which included Defendant's Assistant General Counsel as well as Mr. Evans, Ms. Hernandez, Ms. Spector, and union representative Darnise Henry Bush, for the purpose of discussing Ms. Spector's request for an accommodation. During the meeting, Plaintiff requested the permission to telework two to three days per week as an accommodation.

On April 13, 2016, another meeting was convened for the purpose of discussing Plaintiff's request for an accommodation. Plaintiff's attorney, Plaintiff's union representative, Mr. Evans, Ms. Hernandez, and Defendant's Assistant General Counsel participated. During the

April 13, 2016 meeting, Plaintiff explained to Defendant why she believed some of the job descriptions listed on her position description were not an accurate reflection of her job duties. Ms. Hernandez responded that because Plaintiff was insisting her job description was inaccurate, the agency would need to perform a desk audit on her position, and that it could not accommodate her disability before such audit was completed. Shortly after the meeting, Defendant ordered Barbara Thompson, a Human Resource Specialist in the Human Capital Administration for DDS, to perform an audit of Plaintiff's position. Ms. Thompson did not consult with Ms. Spector while performing the audit; she had been informed that Ms. Spector was not available to participate because "she had been on leave for some time." Thompson Decl. ¶ 4.

Around April 22, 2016, Mr. Evans informed Plaintiff that he had discussed her accommodation request with SSA staff and that SSA had approved it. Mr. Evans informed Ms. Bonsack of SSA's approval sometime shortly thereafter. Plaintiff still did not receive a final determination from Defendant about her accommodation request during the balance of April 2016 or the beginning of May 2016.

In light of Defendant's failure to grant Plaintiff her accommodation, Plaintiff's doctors advised her to take sick leave while her request was pending. Plaintiff heeded her doctor's advice. On May 13, 2016, Plaintiff submitted an FMLA request to Defendant which stated: "I am able to perform the essential functions of my job with reasonable accommodation, but my employer is refusing to make one." Def.'s Ex. 12 at 4.  Plaintiff submitted an application for short-term disability on May 16, 2016, which stated that Plaintiff was advised to stop working on May 13, 2016. The request for short-term disability noted that "[a]ccommodations not yet in

place delay recovery, will impair patient until work accommodations are in place." Def.'s Ex. 12 at 8.

On June 7, 2016, Defendant sent Plaintiff a letter stating that her request to telework was accepted in part and denied in part. The letter asserted, for the first time, that Plaintiff's request was denied because she could not access the SSA online network remotely, but it stated that "[r]ecognizing that [Plaintiff] may be able to perform a limited number of tasks from home, the Agency [was] offering to allow [her] to telecommute one day per pay period." Def.'s Ex. 4 at 23. The next day, on June 8, 2016, Ms. Bonsack addressed to Plaintiff a letter stating that her request for DCFMLA was denied. Ms. Bonsack addressed to Plaintiff a second letter denying her FMLA request on June 15, 2016, this time because "review of [Plaintiff's] medical documentation … indicate[d] that she [could] work the essential functions of [her] job with reasonable accommodations[.]".  Def.'s Ex. 12 at 23.  Defendant again issued Plaintiff a letter denying her FMLA request on June 29, 2016. It stated that Plaintiff's requests were moot because she had represented that she can perform the essential functions of her job.

In September of 2016, Plaintiff's counsel negotiated a teleworking agreement with Defendant.  On September 30, 2016, Plaintiff signed a teleworking agreement which allowed her to telework twice a week. Plaintiff returned to work on October 24, 2016. On October 3, 2016, before Plaintiff returned to work, Defendant reclassified her position, changing her pay-grade from CS-12 to CS-11. On November 16, 2016, Plaintiff was issued her annual performance review for the 2015 to 2016 review period. She received a lower rating, citing Plaintiff's absences from work, which would not have occurred but for Defendant's failure to accommodate her.

Plaintiff did not receive an SSA-issued laptop, which was necessary for her to perform the essential functions of her job remotely, until November 28, 2016.

## II.   <u>LEGAL STANDARD</u>

"Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rush v. Fed. Nat'l Mortg. Ass'n*, 208 F. Supp. 3d 1, 8 (D.D.C. 2016), *aff'd,* 707 F. App'x 9 (D.C. Cir. 2017).  "Material facts are those that 'might affect the outcome of the suit under the governing law.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A genuine issue is one where the evidence is such that a reasonable jury could return a verdict for the nonmoving party, as opposed to evidence that is so one-sided that one party must prevail as a matter of law." *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 124 (D.D.C. 2009)(internal quotation omitted).

 "The party seeking summary judgment bears the initial burden of demonstrating an absence of genuine issue of material fact." *Gordon v. District of Columbia*, 605 F.Supp.2d 239, 241 (D.D.C. 2009). In considering whether there is a triable issue of fact, the court must draw all reasonable inferences in favor of the non-moving party. *Id.* "The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *Rush v. Fed. Nat'l Mortg. Ass'n*, 208 F. Supp. at 8–9.  "When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor." *Faison v. Vance-*

*Cooks*, 896 F. Supp. 2d 37 (D.D.C. 2012). "If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate." *Id.*

## III.   DISCUSSION

### A. The Record Supports a Reasonable Conclusion that Defendant Violated the ADA by Failing to Engage in the Interactive Process and Creating an Unreasonable Delay.

The term "discriminate" under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee … unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 n. 3 (D.C. Cir. 2012)(quoting 42 U.S.C. § 12112(b)(5)(A)). To survive summary judgment on a failure to accommodate claim, a plaintiff must "come forward with sufficient evidence to allow a reasonable jury to conclude that" she meets four elements: "(i) she was disabled within the meaning of the Rehabilitation Act [or ADA];   (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability." *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (internal citations omitted).

Here, Defendant challenges only the fourth element of a *prima facie* claim of failure to accommodate claim:  whether Plaintiff can show that it denied her request for a reasonable accommodation because of her disability.  A plaintiff can show that an employer unreasonably denied her request for an accommodation by showing that the employer failed to engage in the interactive process, *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014), or that it caused an unreasonable delay in granting the accommodation, *Mogenhan v. Napolitano*, 613 F.3d 1162,

1168 (D.C. Cir. 2010). Plaintiff can establish both that Defendant failed to engage with her in the interactive process, and that such failure resulted in an unreasonable delay in Defendant providing her the reasonable accommodation to which she was entitled.

    1.  <u>Defendant Failed to Engage in the Interactive Process in Good Faith.</u>

To satisfy its obligations under the ADA, an employer must engage in the interactive process, "a flexible give-and-take between employer and employee so that together they can determination would accommodation enable the employee to continue working." *Ward v. McDonald*, 762 F.3d at 32 (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)(quotation marks omitted). "Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Id.* "To determine whether the employer held up its end of the bargain, courts look to factors such as whether the employer 'obstructs or delays the interactive process' or 'fails to communicate, by way of initiation or response." *Matos v. DeVos*, 317 F. Supp. 3d 489, 497 (D.D.C. 2018)(quoting *Ward* at 32). *"[O]n summary judgment, courts are instructed to scour the record to look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Pauling v. D.C.*, 286 F. Supp. 3d 179, 211 (D.D.C. 2017)(internal quotations omitted).

Defendant failed to engage in the interactive process with in good faith, and, in fact, exhibited bad faith, in a number of ways. Defendant summarily denied Plaintiff's request for an accommodation less than 48 hours after receiving it, without engaging in any interactive process. Defendant cited insufficient medical documentation for denying Plaintiff's request without requesting further information from Plaintiff or her healthcare providers. Defendant never met with Plaintiff prior to denying her request for an accommodation.

After Plaintiff engaged counsel to represent her in requesting a reasonable accommodation from Defendant, Defendant continued to arbitrarily deny her request for an accommodation, citing shifting and false justifications for doing so. On several different occasions since April 2016, Defendant cited at least eight different justifications for denying Plaintiff's request for an accommodation: (1) insufficient documentation to prove her disability; (2) Plaintiff's position description stating that her job requires daily field work; (3) the agency did not having a telework policy (Hernandez Dep. 50:9-10; 123:123:22-124:1; 124:12); (5) Plaintiff "not wanting to do the work" (Hernandez Dep. 51:13-14); (6) Plaintiff making an supposed open-ended request to telework at her discretion (Bonsack Decl. ¶ 2); (7) Plaintiff insisting on teleworking five days per week; (8) the agency needed to perform a desk audit before any accommodation could be made (Pl.'s Dep. 195:19-21). Each one of these justifications is demonstrably false. See Pl.'s Counterstatement of Material Facts in Dispute Nos. 86-123. Defendant's false and shifting justifications for denying Plaintiff's request are evidence of culpability. *See Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998)("An employer that concocts a false explanation for an employment decision is in a like position to a criminal defendant who offers a false alibi: the jury may consider the fact that the defendant has presented a false alibi in deciding his guilt.").

Moreover, Defendant has cited reasons for denying Plaintiff's requests that are legally invalid. On various occasions, the Defendant stated that it could not grant Plaintiff's request to telework because either SSA or DDS's telework policies did not allow it.  As discussed below, this is false.  But even if true, an accommodation requires a modification to an employer's workplace polices. "It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in

10

order to enable a disabled individual to work." *Pantazes v. Jackson*, 366 F.Supp.2d 57, 69

(D.D.C.2005) (citation omitted).  "By definition, any special 'accommodation' requires the

employer to treat an employee with a disability differently, i.e. preferentially. *Id.* (citation

omitted).  This is true with respect to telework specifically:

> "[T]he ADA's reasonable accommodation obligation, which includes modifying
>
> workplace policies, might require an employer to waive certain eligibility requirements or
>
> otherwise modify its telework program for someone with a disability who needs to work
>
> at home." EEOC Fact Sheet, Work At Home/Telework as a Reasonable Accommodation
>
> (Oct. 27, 2005), http://www.eeoc.gov/facts/telework.html; cf. EEOC, Employer Best
>
> Practices for Workers with Caregiving Responsibilities,
>
> http://www.eeoc.gov/policy/docs/caregiver-best-practices.html (Jan. 19,
>
> 2011)(hereinafter "Telework Fact Sheet").

Indeed, an employer may be required to offer telework as an accommodation even if it has no

telework program or does not allow other employees to telework. *Id.* Thus, even if SSA or DDS

did not already permit teleworking, which it did, Defendant would still have been obliged to

determine whether it was required to modify its policies to allow Plaintiff to telework.

Defendant cites its communications with Plaintiff as evidence of its good faith attempt to

identify a reasonable accommodation for her.  However, these communications actually

demonstrate how Defendant obstructed the interactive process. An employer engages in good

faith in the interactive process when it "show[s] some sign of having considered [the]

employee's request." *Faison v. Vance-Cooks*, 896 F. Supp. 2d at 62.  Defendant's

communications with Plaintiff do not show that it considered her request. For example, in a

March 17, 2016 denial letter, Defendant advises Plaintiff that it cannot grant her request to

telework because "[r]easonable accommodations are granted to employees to better assist them with the performance of their work duties not to lessen their caseload." Def's Ex. 4 at 5.  Such statement cannot constitute a good-faith attempt at identifying an appropriate accommodation. Nowhere in Plaintiff's previous requests for an accommodation did she request a reduced caseload. Quite the opposite, Plaintiff was a highly dedicated employee who persisted in voicing her right to an accommodation to Defendant over its summary denials, unreasonable obstruction, bad faith, hostility, and retaliation, all because she *wanted* to work and understood that continuing to work without an accommodation would jeopardize her ability to work altogether. Indeed, when Plaintiff requested an accommodation from Defendant, she "was very concerned about doing [her] job well and not causing any problems, and [she] was also concerned about having stable health." Pl.'s Dep. 117:22- 118:2. Teleworking as proposed by Plaintiff in no way involved a reduced caseload.  Her hours and job duties were to remain the same, with the only thing different being the location in which they were performed.

2. <u>Defendant Unreasonably Delayed Plaintiff a Reasonable Accommodation to Which she was Entitled, in Violation of the ADA</u>**.**

A plaintiff may prevail on a failure-to-accommodate claim by demonstrating that her employer's bad faith caused it to unreasonably delay granting a reasonable accommodation. *McNair v. D.C.*, 11 F. Supp. 3d 10, 17 (D.D.C. 2014); *see also Pantazes v. Jackson*, 366 F.Supp.2d 57, 70 (D.D.C.2005) (T]he absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation."). "In determining whether a particular delay is unreasonable, courts look to factors such as the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating the particular request, and whether the employer has acted in good faith."  *Matos v.*

*DeVos*, 317 F. Supp. 3d at 499 (quotation marks omitted). Plaintiff can show that she requested a

reasonable accommodation, but that Defendant unreasonably delayed in providing it.

a)   Plaintiff Requested a Reasonable Accommodation.

An accommodation may be "reasonable on its face, *i.e.*, ordinarily or in the run of cases,"

or it may be reasonable as applied, i.e., "on the particular facts" of the case[.]" *Taylor v. Rice*,

451 F.3d 898, 908 (D.C. Cir. 2006)(internal citations omitted). The particular accommodation

Plaintiff requested – teleworking two to three days per week -- was reasonable on its face and in

the run of cases. The EEOC recognizes teleworking as a reasonable accommodation. EEOC

Enforcement Guidance on Reasonable Accommodation ¶ 32, http://www.eeoc.

gov/policy/docs/accommodation.html. This jurisdiction recognizes that, in appropriate

circumstances, the ADA requires that an agency consider allowing teleworking as a reasonable

accommodation. *Buie v. Berrien*, 85 F. Supp. 3d 161, 173 (D.D.C. 2015)(citing *Carr v. Reno*, 23

F.3d 525, 530 (D.C. Cir. 1994). According to the EEOC:

> Several factors should be considered in determining the feasibility of working at
> home, including the employer's ability to supervise the employee adequately and
> whether any duties require use of certain equipment or tools that cannot be
> replicated at home. Other critical considerations include whether there is a need
> for face-to-face interaction and coordination of work with other employees;
> whether in-person interaction with outside colleagues, clients, or customers is
> necessary; and whether the position in question requires the employee to have
> immediate access to documents or other information located only in the
> workplace. An employer should not, however, deny a request to work at home as
> a reasonable accommodation solely because a job involves some contact and
> coordination with other employees. Frequently, meetings can be conducted
> effectively by telephone and information can be exchanged quickly through e-
> mail.

Telework Fact Sheet ¶ 4.

Those factors demonstrate the feasibility of Plaintiff's request for teleworking two

to three days per week. With Plaintiff's indisputably favorable performance evaluations,

Plaintiff could perform her duties with minimal supervision. Moreover, teleworking was

technologically feasible. The vast majority of Plaintiff's work was conducted on SSA's database. The SSA had already developed the technology and infrastructure for its employees access its database remotely, *and was willing*, *as early as April 2016*, to provide Plaintiff a laptop equipped for her to do so. To the extent that Plaintiff's job involved interacting with others, the record demonstrates that aspect of her position *did not* occupy more than 50 percent of her time, and at least in part could be performed over the phone. Plaintiff's job duties did not involve impromptu team meetings; any in-person contacts could be scheduled ahead of time. *Cf. Doak v. Johnson*, 798 F.3d 1096, 1106 (D.C. Cir. 2015)(teleworking not a reasonable accommodation where position involved daily meetings, and "'[s]pontaneous' meetings with various personnel 'occur[ed] frequently[.]'"). The feasibility of Plaintiff's request is further evidenced by the fact that both SSA and DDS had policies allowing employees to telework at the time Plaintiff made her request.

Defendant claims that "DDS could not grant Plaintiff's requests to telework every day or on any day she felt it necessary." Def.'s Mem. at 16. Plaintiff never told anyone within DDS that her request to telework was open-ended. Pl.'s Dep. 127:10-12. Plaintiff never told anyone within DDS that she would determine, at her convenience, when to telework. Pl.'s Dep. 127:13-16; 127:17-128:3; 200:6-8. Instead, Plaintiff requested the ability to telework two days per week and agreed to do so on a set schedule. Pl.'s Dep. 200: 9-14. Thus, Plaintiff's request for an accommodation, was reasonable on its face, and as applied to her particular circumstances.

> b) Defendant Unreasonably Delayed Providing the Reasonable Accommodation to which Plaintiff was Entitled.

Defendant's bad faith resulted in an unreasonable delay in granting her request to telework. As noted, "[i]n determining whether a particular delay is unreasonable, courts look to factors such as the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating the particular request, and whether the employer has acted in good faith." *Matos v. DeVos*, 317 F. Supp. 3d at 499 (quotation marks omitted). Each of these factors weighs in favor of Plaintiff.

Plaintiff first requested an accommodation before <u>March 2016</u>. She was not accommodated by Defendant until <u>November 28, 2017</u>, when Defendant finally issued Plaintiff an SSA-equipped laptop. During the interim almost nine months, Plaintiff endured unnecessary hardship, had to hire an attorney, participated in various meetings with Defendant, and filed and litigated an EEOC charge, just to receive the reasonable accommodation to which she was lawfully entitled.

None of the justifications Defendant has offered for this delay has any merit. Defendant states that:

> the SSA did not allow DDS employees to access [its] database remotely. Nevertheless, after Plaintiff made her request, Evans contacted SSA, and requested permission for Plaintiff to teleworking. In response to Evans' request, SSA changed its policy that summer. Once SSA lifted this restriction, DDS worked with Plaintiff to find a reasonable accommodation.

Def.'s Mem. at 16. In its EEOC Position Statement, Defendant stated that Plaintiff "would not be able to perform her job duties even at home because, as her job description details, she works with sensitive social security information that she cannot access at home." Position Statement at 12. These statements are not supported by Defendant's citations to the record, and are directly contradicted by the evidence. SSA policy did not preclude DDS employees from remotely

15

accessing its database in March 2016. Defendant admits that two DDS employees had such access at the time. *Nicole Appleman v. District of Columbia Department on Disability Services*, EEOC Charge No. 570-2016-01054, Respondent Agency Position Statement ("Position Statement") at 2. Bonsack Decl. ¶ 6. Evans Dep. 78: 7-12.

Moreover, in 2013, SSA launched a teleworking program that allowed employees to access its database remotely without jeopardizing confidential information. Office of the Inspector General Social Security Administration Congressional Response Report, *The Social Security Administration's Telework Program and its Effect on Customer Service*, No. A-04-17-50267 (July 2017), available at https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-04-17-50267.pdf ("OIG Rep.") at 2.  Indeed, the evidence suggests there was never any restriction on access to the SSA database. Evans Dep. 97:2-7; Def.'s Resp. to Pl.'s Interrogatories at 18 ("Telework was available to DDS employees … provided the employee followed the SSA guidelines, which included an SSA suitability determination process.").

Sometime before March 2016, when Plaintiff discussed the possibility of her teleworking with Mr. Evans and he said it would be no problem. Mr. Evans said it would not be an issue for SSA to issue Plaintiff a laptop. Pl.'s Dep. 113:9-13. Mr. Evans never mentioned an SSA policy against teleworking. Pl.'s Dep. 114:3-14. Mr. Evans told Plaintiff that SSA "certainly would allow her to have remote access" to its network. Evans Dep. 43:6-7. Yet even if the necessary access was so restricted, that would not have stopped Defendant from accommodating Plaintiff. Mr. Evans requested and obtained permission from SSA for Plaintiff to telework, and the necessary laptop equipment, in April 2016. Pl.'s Dep. 106: 15-17. Pl.'s Dep. 106: 18-20; Evans Dep. 41:20-21; 47:1-3; 84:7-18. Defendant does not explain why, in June 2016, Defendant again denied Plaintiff's request to telework, citing SSA restrictions. Nothing about accessing the SSA

database remotely precluded Defendant from granting Plaintiff's teleworking request until November 28, 2016.

Elsewhere, Defendant cited its lack of a teleworking policy as a basis for denying Plaintiff's request to telework. When Ms. Hernandez met with Plaintiff, at her attorney's request, to discuss her request for an accommodation, Ms. Hernandez stated that DDS did not have a telework policy and thus would need to deny her request. Hernandez Dep. 39:19-40:1. Ms. Hernandez stated repeatedly under oath that DDS did not have a teleworking policy. Hernandez Dep. 33:2-4; 50:9-10, 50:19-20; 123:123:22-124:1; 124:12. Yet DDS had a teleworking policy in effect as of January 2015. See DDS Telecommuting Policy, No. 2015-DDS-022, available at https://dds.dc.gov/sites/default/files/dc/sites/dds/publication/attachments/Telecommuting%20Policy.pdf. To the extent that this policy may not have covered Plaintiff's position or grade level, Defendant was required to consider modifying that policy for Plaintiff if teleworking was a reasonable accommodation and Defendant could not demonstrate undue hardship. Defendant has not pleaded the affirmative defense of undue hardship, and thus waived the defense. However, absent such waiver, Defendant still would not be able to demonstrate an undue hardship.

Another baseless defense Defendant has offered for delaying granting Plaintiff an accommodation for eight months is the need to conduct a desk audit on her position. Yet did not actually perform a desk audit; it performed a job reclassification without consulting Plaintiff; and it has never explained why the reclassification took several months to perform. Moreover, the reclassification, which resulted in a reduction in pay grade and excluded Plaintiff's high-level job duties, is more evidence of Defendant's retaliatory motive than good faith.

Defendant did not offer Plaintiff an alternative accommodation while determining whether teleworking was feasible. Defendant claims that it offered Plaintiff access to Metro

17

Access Paratransit and one day of telework per week. Def.'s Mem. at 15 n. 11. However, Defendant did not "offer" Plaintiff access to MetroAccess Transit, which is a complimentary service provided by WMATA,[3] nor would that service have accommodated Plaintiff. Pl.'s Dep. 201:16-22; 202:5-14, 205:16-20. The record is clear that Defendant never offered Plaintiff one day of telework per week. Here, Defendant yet again inaccurately cites the record. Defendant's Exhibit 4, pages 21-22 state that Defendant offered Plaintiff the ability to telework one day per *pay period*, which is every two weeks. Plaintiff also disputes that Defendant made this supposed offer. Pl.'s Dep. 197:5-11; 203: 10-16.  Instead, during the April 13, 2016 meeting, Plaintiff was told that a desk-audit was needed before her disability could be accommodated. Pl.'s Dep. 200:20-22; 195:19-21; 203:14-16; 209:6-11.

Finally, the record is replete with evidence of Defendant's bad faith. First, as noted, Defendant's bad faith is demonstrated by the false and inconsistent explanations offered by Defendant for denying Plaintiff's request for an accommodation. Instead of working with Plaintiff or her doctor to identify a reasonable accommodation, Defendant summarily denied her request, and then, only after Plaintiff's counsel became involved, Defendant offered a series of demonstrably false, shifting justifications for its decisions, which appear more like a calculated attempt to feign compliance with the ADA than to interact with Plaintiff in good faith to identify a reasonable accommodation.

Second, the decisionmakers in this matter have displayed bias and hostility toward Plaintiff due to her disability and request for an accommodation. When Plaintiff first discussed

---

[3] MetroAccess Transit is funded by WMATA, not DDS.  See Def.'s Ex. 4, Interactive Process Communications, 21-22 ("The Agency also offered you the option of using Metro Access Paratransit through the Washington Metropolitan Area Transit Authority in lieu of driving to decrease fatigue."); Hernandez Dep. 128:21-22; Def.'s Response to Pl.'s Interrogatories at 16. See also MetroAccess Customer Guide, available at https://www.wmata.com/service/accessibility/metro-access/customer-guide.cfm#what ("What is MetroAccess?" "MetroAccess is a service of the Washington Metropolitan Area Transit Authority (Metro), and is the region's complementary paratransit service offered in accordance with the Americans with Disabilities Act (ADA).")

teleworking with Mr. Evans, he told her that Ms. Bonsack and Hernandez would deny her request. Pl.'s Dep. 106: 10-12, 107:10-11. When Ms. Hernandez denied Plaintiff's request to telework on March 9, 2016, she had not discussed the request with Mr. Evans. Evans Dep. 35:6-10.  Additionally, Ms. Hernandez admits that she never met or spoke with an SSA representative about whether DDS employees could telework. Hernandez Dep. 120: 4-12. While failing to consult with Plaintiff's doctors, Ms. Bonsack discussed confidential information about Plaintiff's disability with Mr. Evans, Evans Dep. 86:20-87:10 and expressed doubt about Plaintiff's ability to work, even with an accommodation, Evans Dep. 85:10-14; 86:13-16; Pl.'s Dep. 172:5-7.

Third, Ms. Bonsack and Ms. Hernandez exhibited bad faith by unreasonably restricting Plaintiff's communication with Mr. Evans, her direct supervisor, when he was the person who was best informed about Plaintiff's job duties and procedures for obtaining remote access to SSA's secure database. Ms. Bonsack and Hernandez instructed Mr. Evans not to speak with Plaintiff. Evans Dep. 129:20-22; 141:5-22.  Plaintiff requested Mr. Evan's participation in the meeting. Hernandez Dep. 70: 12-14. Although Mr. Evans was technically present during the meeting, he did not say anything the whole time, and when Plaintiff asked Mr. Evans why, he explained that Ms. Hernandez instructed him not to say anything. Pl.'s Dep. 207:12-16. Finally, Defendants exhibited bad faith by stating that they could not accommodate Plaintiff until they reclassified Plaintiff's job, only to completely exclude her from the process.

## B. A Reasonable Jury Could Find that Defendant Retaliated Against Plaintiff.

Next, Defendant has failed to demonstrate that it is entitled to summary judgment on Plaintiff's retaliation claim. "To establish a *prima facie* case of retaliation based on circumstantial evidence, a plaintiff must show that (i) she engaged in statutorily protected activity; (ii) she suffered a materially adverse action by her employer; and (iii) a causal link

connects the two." *Doak v. Johnson*, 798 F.3d at 1107 (alterations omitted). "If a *prima facie*

case is established, the burden shifts to the employer to produce a legitimate, nondiscriminatory

reasons for its action." *Id.* Since March 7, 2016, Plaintiff has requested an accommodation,

opposed Defendant's failure to grant her an accommodation to which she was lawfully entitled,

reiterated her requests for an accommodation, provided additional medical documentation of her

condition even though it was never requested, and advocated for her rights under the ADA. She

has also filed an EEOC charge alleging disability and gender discrimination and requested

FMLA. These activities constitute protected activities. Defendant does not dispute Plaintiff's

ability to demonstrate protected activity, but argues that she cannot establish a causal connection

between such protected activity and an adverse employment action. Defendant fails to carry its

burden on summary judgment with respect to such argument.

    1.  <u>Defendant Committed an Adverse Action</u>.

Defendant committed at least three adverse employment actions against Plaintiff in

connection with her protected activity:  denying her an SSA-issued laptop which was necessary

for her to perform the essential functions of her job, lowering her pay grade, and issuing a

negative performance evaluation. Defendant contends that none of these actions is materially

adverse, as a matter of law. Once again, Defendant is incorrect.  An adverse action occurs "when

an employee 'experiences materially adverse consequences affecting the terms, conditions, or

privileges of employment or future employment opportunities such that a reasonable trier of fact

could find objectively tangible harm.'" *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C.Cir.2006). A

materially adverse action may include one that affects the plaintiff's "position, grade level,

salary, or promotion opportunities." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009).

Arbitrarily denying Plaintiff access to the SSA laptop had a tangible impact on her employment because it precluded her from working for eight months, forcing Plaintiff to remain in leave without pay status. Lowering Plaintiff's pay grade had a materially adverse consequence affecting Plaintiff's employment because it was certain to impact her salary and promotional opportunities. Defendant has admitted that after two years of being grandfathered in, Plaintiff would receive a lower job salary. The negative performance evaluation had material consequences because Plaintiff's rating was lowered from a "Highly Valued Performer" to a "Valued Performer." In a competitive job market, this lowered rating negative impacted Plaintiff's ability to secure new employment.

    2.   <u>Plaintiff Satisfies the Requisite Causal Connection</u>.

The record contains probative evidence that Defendant imposed the above-listed adverse actions because of Plaintiff's protected activities. For example, Ms. Hernandez initiated the reclassification of Plaintiff's position, resulting in a reduction in grade level, during or immediately after the April 2016 meeting at which Plaintiff raised inaccuracies in her job description. Also, shortly after the April 2016 meeting, Mr. Evans told Plaintiff that Ms. Bonsack and Ms. Hernandez "were going to get her" for her statements in the meeting. Moreover, Plaintiff filed her EEOC Charge March 24, 2016. Defendant continued to deny Plaintiff's request for an accommodation from March – September 2016, and in June 2016, arbitrarily denied Plaintiff's request for FMLA, thus establishing temporal proximity.

Defendant raises two arguments why Plaintiff cannot establish causation, both of which must fail. First, Defendant argues that Plaintiff cannot prevail on her retaliation claim because she cannot show close temporal proximity. Second, Defendant argues that Plaintiff cannot establish causation with respect to the job reclassification because she cannot show that the

decisionmaker was aware of her protected activity. Neither argument satisfies Defendant's burden on summary judgment.

Plaintiff can demonstrate close temporal proximity between her protected activity and an adverse action. First, as mentioned, Plaintiff engaged in protected activity during the April 13, 2016 meeting with Defendant. A reasonable jury could conclude, based on the record, that at the same meeting, and shortly thereafter, Defendant decided to use job reclassification as a method of punishing Plaintiff. For example, when, in April 2016, Plaintiff's counsel told Defendant that it had failed to engage in the interactive process in good faith and counseled Defendant to correct its behavior, Plaintiff engaged in activity that is protected by the ADA. Almost immediately thereafter, Defendant began to exhibit retaliatory animus.  During the April 13, 2016 meeting, Plaintiff identified inaccuracies in her job description.  What began as a meeting convened to discuss accommodating Plaintiff shifted to a conversation about reclassifying her position. Ms. Hernandez stated to Plaintiff that because of her representations about her job duties, the agency could no longer accommodate her until it performed a desk audit.  That same day, or shortly thereafter, Mr. Evans told Plaintiff "they are going to get you for that," and Ms. Hernandez instructed Ms. Thompson to perform the audit on her job description.

When Plaintiff returned to work several months later, in October 2016, she learned for the first time that Defendant had reclassified her job, resulting in a lower paygrade, because of Plaintiff's representations about her job duties, which Ms. Hernandez stated were a "major, major, major, thing." Despite insisting that Plaintiff was the impetus for the job reclassification, Defendant unreasonably failed to consult her in the process. When Plaintiff raised inaccuracies in the job description at the October 24, 2016 meeting, Ms. Hernandez repeatedly cut her off, emphasized that the reclassification was prompted by Plaintiff, and stated that Plaintiff could

have a desk audit if she wanted one, but that such audits were on indefinite hold. Ms. Hernandez expressed that the revised position description otherwise stood as is.  Further, contrary to Defendant's argument that the decision-maker was unaware of Plaintiff's protected activity, throughout the meeting in October, Darryl Evans confirmed that he assisted Ms. Thompson in completing the new job description and reclassification—clearly demonstrating that the supervisor knowledgeable about Plaintiff's protected activity assisted in demoting Plaintiff. *See* Pl's Exhibit 8.  By showing close temporal proximity and other evidence connecting the adverse action and protected activity, Plaintiff has established a triable issue of fact with respect to causation.

Defendant may argue that temporal proximity is lacking because the reclassified job description was not signed until October 2016. However, based on Defendant's inconsistent statements about the reclassification, the irregularities in the way it was carried out, and the inexplicable exclusion of Plaintiff from the process, a reasonably jury could infer that Defendant had already concluded, as early as April 2016, that it would use the reclassification as a pretext for lowering Plaintiff's job description in retaliation for her protected activity. A jury also could reasonably infer that Defendant only waited to announce the results of the reclassification until October 2016 because that is when it knew Plaintiff would soon be returning to work.

Second, Defendant argues that Plaintiff cannot, as a matter of law, establish causation, because she cannot show that the decisionmaker, whom Defendant identifies as Barbara Thompson, had knowledge of her protected activity.  However, the transcription of the meeting discussing the reclassification precludes the court from finding that Ms. Thompson was, in fact, the ultimate decisionmaker with respect to Plaintiff's job reclassification.  Far more probative evidence in the record shows that Ms. Thompson was only the conduit for Ms. Hernandez and

Ms. Bonsack, who ordered, directed, and ultimately approved of the reclassification.  For

example, the reclassification was ordered by Ms. Hernandez. Ms. Thompson completed her

review of Plaintiff's position in September 2 2016, but Ms. Hernandez, who had final approval,

did not sign off on the reclassification until October 2016. Thompson Decl. Moreover, Ms.

Hernandez and Ms. Bonsack, as the head of Defendant's human resources office, were Ms.

Thompson's superiors.

### C.  Plaintiff is Entitled to a Jury Trial on Her Retaliatory Hostile Work Environment Claim.

Genuine issues of material fact in the record preclude the Court from granting Defendant

summary judgment on Plaintiff's retaliatory hostile work environment claim.  Defendant argues

that Plaintiff cannot prevail on her claim because the facts she alleges in support thereof are not

sufficiently severe or pervasive to alter her working conditions. Defendant argues further that

even if a jury reasonably could find that Plaintiff's work conditions amounted to a hostile work

environment, she offers no proof of those working conditions apart from her own self-serving

testimony. Again, Defendant is wrong on both fronts.

After Plaintiff requested an accommodation, opposed Defendant's failure to

accommodate her, and filed an EEOC Charge, she was subjected to severe and pervasive

retaliatory treatment which altered the terms and conditions of her employment.  First, when

Plaintiff called the meeting, in April 2016, to identify inaccuracies in her position description,

which were cited by Defendant as a reason to deny her request to telework, Defendant indicated

that it could no longer grant Plaintiff an accommodation.  Defendant was clear that because

Plaintiff had challenged Defendant's description of her job duties, it was going to withhold an

accommodation from her until it could perform a desk audit. Rather than actually conducting a

desk audit, however, Defendant proceeded to reclassify Plaintiff's job to a lower grade level

without consulting Plaintiff, a process which dragged on for several months. When Plaintiff returned to work from her disability leave, she learned that she had been demoted. Both Plaintiff and her supervisor, Darryl Evans, felt that Defendant had omitted Plaintiff's high-level duties from the job description, but when Plaintiff brought this to Ms. Hernandez's attention, Ms. Hernandez made clear that the revision was final, stating that the only way to change it was to request a desk audit, but that Mayor Bowser had placed an indefinite hold on all desk audits.

When Plaintiff returned to work, she received a negative performance evaluation, which cited a training and other work Plaintiff missed due to her disability.  Defendant also retaliated against Plaintiff by withholding issuance of the SSA laptop until late November 2016, when an SSA-issued laptop was available for Plaintiff to use in April 2016. Defendant significantly decreased Plaintiff's job responsibilities. Pl.'s Dep. 363: 16-19. Moreover, Defendant isolated Plaintiff after she engaged in protected activity, making it impossible for Plaintiff to do her job. Pl.'s Dep. 166:18-22. She testified that her boss would not speak to her, scheduled meetings without her left her off emails, and withheld key information from Plaintiff that was necessary for her to perform her job duties. Pl.'s Dep. 364:1-6; 9-13; 18-20; 365:1-5; 8-13.

Plaintiff offers more than her own testimony in support of her hostile work environment claim. As noted previously, Mr. Evans testified that Ms. Bonsack and Ms. Hernandez ordered him not to communicate directly with Plaintiff after she requested an accommodation or to speak up at meetings convened to discuss Plaintiff's request for an accommodation. Evans Dep. 116:5-7; 129:15-22. Mr. Evans was Plaintiff's direct supervisor, and someone with whom she enjoyed a positive working relationship before Defendant denied her request for an accommodation. Pl.'s Dep. 43:8-22. A reasonable jury could infer that Defendant intentionally isolated Plaintiff from her coworkers in retaliation for her protected activities, making her working conditions hostile.

25

Furthermore, the attached declaration demonstrates the severity of Defendant's conduct by

showing Defendant's actions impacted Ms. Spector.  See Pl's Exhibit 9

A reasonable jury could also conclude that this hostility was sufficiently severe or

pervasive that it altered the conditions of Plaintiff's job. Plaintiff felt that the torment, ridicule,

and isolation she faced at work were so severe that she needed to quit her job. Pl.'s Dep. 166:18-

22.

### D.  Defendant Violated Plaintiff's Statutory Rights Under The FMLA

1.  <u>FMLA Interference</u>

 Plaintiff has presented evidence to establish a claim for interference of her rights under

FMLA. An employer may be held liable for violating the FMLA for an interference claim under

§ 2615(a)(1), in which the employer has restrained, denied, or interfered with the employee's

substantive rights under the Act. *Roseboro v. Billington*, 606 F. Supp. 2d 104, 107 (D.D.C.

2009). Although the D.C. Circuit has never clearly articulated the elements of an FMLA-

interference claim, in other circuits a plaintiff employee must "prove that: (1) she was eligible for

the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to

take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5)

her employer denied her FMLA benefits to which she was entitled.  *Elzeneiny v. D.C.*, 195 F.

Supp. 3d 207, 217 (D.D.C. 2016).

Though it cites a slightly different test, Defendant's essential argument is that Plaintiff

fails to prove element three, that she is entitled to take leave under FMLA. The statute states that

an employee is entitled to leave under FMLA "because of a serious health condition that makes

the employee unable to perform the functions of the position of such employee." 29 U.S.C. §

2612(a)(1)(D). Defendant relies on a clear misreading of the medical certification which Plaintiff

and Plaintiff's physician completed. Both Ms. Spector and Dr. Nayer make clear that, without

the recommended accommodation, Plaintiff <u>cannot</u> perform the essential functions of her

position. Dr. Nayar's answer to question 4 states that Plaintiff "would require leave until [work

accommodations] are in place." In question number 5, he responded that the Plaintiff's

incapacity will be a continuous period of time "until work accommodation is in place." Def's Ex.

12 at 5-6.  It is clear that Plaintiff had a serious health condition which prevented her from

working absent grant of her requested accommodations.

Plaintiff has further established that she was damaged by Defendant's interference with

her FMLA rights. The statute allows an individual to recover "when the employee loses

compensation or benefits by reason of the violation, sustains other monetary losses as a direct

result of the violation, or suffers some loss in employment status remediable through appropriate

equitable relief." *Roseboro v. Billington*, 606 F. Supp. 2d 104, 108 (D.D.C. 2009) (*quoting Reed

v. Buckeye Fire Equip.*, 241 Fed.Appx. 917, 924 (4th Cir.2007) (*citing* 29 U.S.C. §

2617(a)(1)(A)(i)(I)-(II), (B)) (internal quotations omitted).  Plaintiff was harmed by being forced

to use her accrued sick leave from May 16 until June 1, 2016 until she was placed on short term

disability leave.   Ms. Spector was also damaged by being forced to take "a lot more

appointments with my psychologist." Pl's Dep. 305:12-18. This increase in appointments meant

an increase in out-of-pocket cost to Spector, as a direct result from Defendant's interference with

her FMLA rights. Additionally, being placed on administrative leave meant Spector was not

accruing other benefits such as leave and retirement benefits. These are all recoverable as "other

monetary losses" that resulted from the violation.

Finally, Spector's 2015-2016 evaluation was lower because she was out of the office on

unpaid leave. Plaintiff is entitled to equitable relief in the removal of this evaluation from her

record as it represents a loss in employment status. Plaintiff has thus presented evidence to show that she has suffered damages as a result of Defendant's interference that are recoverable under the FMLA.

2.  FMLA Retaliation

A Plaintiff can bring a "retaliation" claim under § 2615(a)(2) when an employer has "discharge[d] or in any other manner discriminate[d] against" the employee for engaging in conduct protected by the FMLA. *Coulibaly v. Tillerson*, 273 F. Supp. 3d 16, 39 (D.D.C. 2017). The D.C. Circuit has adopted the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for FMLA retaliation claims. *Id.* (*citing Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161 (D.C. Cir. 2015) ("The legislative history explains that this provision was "derived" from a Title VII provision that is universally taken as creating a retaliation claim, 42 U.S.C. § 2000e–3, and that the FMLA provision "is intended to be construed in the same manner.")). To establish a prima facie case of FMLA retaliation, a Plaintiff must show (1) that she "engaged in a protected activity under this statute"; (2) that she "was adversely affected by an employment decision"; and (3) that "the protected activity and the adverse employment action were causally connected." *Id.* Additionally, this Court has held that FMLA claimants must demonstrate "prejudice" as defined by the statute's enumerated remedies, which include "damages equal to the amount of...any actual monetary losses sustained by the employee as a direct result of the violation." *Gordon* at 162 (*quoting Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002)(citing § 2617(a)(1)(A)(i)(II)).

Defendant only argument related to her FMLA retaliation claim is that Plaintiff did not allegedly experience an adverse employment action because it claims she did not suffer a loss in

compensation as a result of the Agency's retaliation. The FMLA allows an individual to recover "when the employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief." *Roseboro v. Billington*, 606 F. Supp. 2d 104, 108 (D.D.C. 2009) (*quoting Reed v. Buckeye Fire Equip.*, 241 Fed.Appx. 917, 924 (4th Cir.2007) (*citing* 29 U.S.C. § 2617(a)(1)(A)(i)(I)-(II), (B)) (internal quotations omitted).

Plaintiff has established through significant evidence that Defendant took adverse employment action following her request for FMLA leave, including: delaying the assigning of her an SSA-authorized laptop until November 2016, well after the Agency was able; reducing her pay-scale grade from twelve (12) to eleven (11), in violation of a pervious EEO settlement-agreement; lowering her yearly performance review; and removing job duties and intentionally obstructing her ability to complete assigned tasks. Each of these are instances of adverse personnel actions and meet the required element of an FMLA retaliation claim. Plaintiff suffered prejudice (i.e. "actual monetary losses") when Defendant's retaliatory actions kept her from returning to full employment sooner by intentionally delaying assigning her an SSA laptop. This kept her on unpaid 'administrative leave,' causing her to lose both salary and benefits. Also, when Defendant reduced Plaintiff's her pay-scale grade, it led to a reduction in pay and benefits earned. Finally, the FMLA statute provides that "[t]he court ... shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." *Roseboro v. Billington*, 618 F. Supp. 2d 85, 87 (D.D.C. 2009) (*quoting* 29 U.S.C. § 2617(a)(3)). Since Plaintiff has established a cause of

action and recoverable damages under FMLA, she is also entitled to recover reasonable attorney's fees and other costs of actions from Defendant.

## IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment with respect to Plaintiff's claims for failure to accommodate and retaliation.

Dated: December 10, 2018

Respectfully submitted,

_____/s/Denise M. Clark_____
Denise M. Clark
Clark Law Group, PLLC
1100 Connecticut Ave., NW, Suite 920
Washington, DC 20036
dmclark@benefitcousnel.com
202-293-0015 Phone
202-293-0115 Fax

*Counsel for Plaintiff Nicole Spector*

## **CERTIFICATE OF SERVICE**

I certify that on December 11, 2018, I served the Plaintiff's Memorandum Opposing

Defendant's Motion for Summary Judgment via CM/ECF.


/s/ Denise M. Clark
Denise M. Clark