NICOLE SPECTOR,

    *Plaintiff*,

  v.             Civil Action No. 1:17-cv-01884 (CJN)

THE DISTRICT OF COLUMBIA,

    *Defendant*.

## MEMORANDUM OPINION

   Plaintiff Nicole Spector was a Medical Liaison Officer in the Social Security Disability Determination Division of the D.C. Department on Disability Services ("the Department"). Am. Compl. ¶ 19, ECF No. 10-1. After leaving her position, she sued the District of Columbia for discrimination, retaliation, and a hostile work environment under Title I of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. §§ 12101 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*; and for retaliation and unlawful interference with leave under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601 *et seq*. *See generally* Am. Compl. Following discovery, the District moved for summary judgment on all counts. *See generally* Def.'s Mot. for Summ. J. ("Mot."), ECF No. 24. The Court denies the Motion on the counts alleging failure to accommodate (Count I), Rehabilitation Act retaliation (Count III), and FMLA retaliation (Count VI), and grants summary judgment for the District on all remaining counts.

# I.    Background

The Disability Determination Division is a specialized sub-agency of the D.C. government located within the Department on Disability Services.  Mot. at 3.; Am. Compl. ¶¶ 19, 23.  Although the Department's personnel are District employees, its tasking and funding come from the federal Social Security Administration.  Mot. at 3–4.  The Department's employees process D.C. residents' applications for Social Security Disability Insurance, work with medical providers who examine applicants to evaluate their claims, and make initial disability determinations.  *Id.*; Am. Compl. ¶ 23.  Spector[1] began her employment with the Department in 2009.  Am. Compl. ¶ 18.  She became the Disability Determination Division's Medical Liaison Officer in 2014.  Pl.'s Counter-Statement of Material Facts as to which There is a Genuine Issue ("Pl.'s SOMF") ¶ 1, ECF No. 27-1.

## A.    Initial Request for an Accommodation

That same year, Spector's physician diagnosed her with myasthenia gravis, a neuromuscular disorder that causes muscle fatigue, blurry vision, and respiratory difficulty.  Def.'s Reply to Pl.'s SOMF ¶ 2, ECF No. 28-1.  After several rounds of treatment and surgery failed to relieve her symptoms, Spector's physicians recommended that she request a teleworking accommodation to eliminate her commute and keep her from the rigors of an office setting for two or three days each week.  *Id.* ¶¶ 5–6.

In early 2016, Spector approached her supervisor, Darryl Evans, and informally inquired about obtaining such an accommodation.  *Id.* ¶ 7.  He agreed that it might be possible and promised to contact the Social Security Administration to request that it issue Spector a laptop

---

[1] Spector, formerly Nicole Appleman, changed her last name during the events at issue in this litigation.  The Court uses her current name to refer to her throughout the Opinion even though some documents in the record use her former name.

and telework authorization. *Id.* Social Security's approval was necessary because Spector's work required access to Social Security computer systems. Pl.'s SOMF ¶ 4. On March 7, Spector filed a formal request for an accommodation and attached medical documentation from her physicians. Pl.'s Accommodation Req., ECF No. 24-4. She did not specify how often she was requesting to work from home. *Id.*; *see also* Supporting Medical Documents, ECF No. 27-4 at 2, 6. Two days later, Spector received a letter from Gria Hernandez, the Department's Human Capital Administrator, denying the accommodation "due to insufficient documentation to prove that [Spector's] health condition [made her] unable to work in an office environment." Gria Hernandez's Ltr. of Mar. 9, 2019, ECF No. 24-3 at 1. In response, Spector hired an attorney, who formally petitioned for reconsideration a few days later. Pl.'s Ltr. of Mar. 14, 2016, ECF No. 24-3 at 2–3.

The Department then altered its explanation for why the accommodation was not possible. Rather than denying telework authorization for a lack of medical evidence, it pointed to Spector's official position description, which indicated that her duties required her to be "in the field daily to conduct annual onsite reviews, conduct onsite orientation and training to new consultative examiners and inspect work sites." Hernandez's Ltr. of Mar. 17, 2016, ECF No. 24-3 at 4. The Department determined that the performance of these duties was inconsistent with a telecommuting arrangement and again denied Spector's request. *Id.*

On March 24, Spector filed a complaint with the Equal Employment Opportunity Commission. Pl.'s EEOC Compl., ECF No. 24-9. The Department reiterated its position in a follow-up letter and invited Spector to suggest alternative accommodations that might permit her to continue working. Kasia M. Preneta's Ltr. of Mar. 31, 2016, ECF No. 24-3 at 10–11. Spector contested the position description's accuracy and requested a copy so that she could compare the

description to her actual duties. Pl.'s Ltr. of Apr. 5, 2016, ECF No. 24-3 at 12–13. She asserted that she rarely performed work in the field and that she could perform the vast majority of her duties remotely. *Id.* Over the next month, the Parties traded correspondence and met face-to-face to discuss potential alternative arrangements, and Spector submitted additional medical documentation. *See generally* Negotiation Correspondence, ECF No. 24-3. The Department offered to adjust Spector's work schedule, to authorize her to work from home one day every two weeks, and to facilitate MetroAccess transportation between Spector's home and the office to relieve her of her need to drive herself, but Spector insisted that she needed to telecommute two or three days each week. Deborah Bonsack's Ltr. of Jun. 7, 2016 (recounting meeting of Apr. 11, 2016), ECF No. 24-3 at 21; Pl.'s Ltr. of Jun. 17, 2016 (same), ECF No. 24-3 at 24. On one occasion during this period, Spector overheard Deborah Bonsack, the Department's Deputy Director for Administration, mocking her to a colleague and questioning whether the request for an accommodation was genuine. Pl.'s Dep. 172:4–9, ECF No. 24-1.

During the spring, the Department focused on whether Spector's official position description accurately reflected her job duties. *See, e.g.*, Preneta's Email of Apr. 13, 2016, ECF No. 24-3 at 16–20. But it also identified Social Security network security as a second impediment to telework. Bonsack's Ltr. of Jun. 7, 2016, ECF No. 24-3 at 21–22. When Spector first made her request, she knew of at least two other Department employees whom she believed were able to access the Department's computer systems remotely: her supervisor Darryl Evans and IT support technician Roberto Cofino. Pl.'s Dep. 119:15–22. It was Evans who had previously agreed to petition the Social Security Administration for Spector to receive access. Evans Dep. 31:2–32:13, ECF No. 24-2.

But Evans soon discovered that the proposal might be inconsistent with Social Security Administration policy. *Id.* Although Evans and Spector were D.C. employees, their work involved access to secured federal computer databases containing applicants' sensitive medical information. *Id.* at 33:13–40:7. According to Evans, as of March 2016, the Social Security Administration did not permit remote access to those databases; state-level employees had to be at physically controlled workstations to access that information. *Id.* at 94:18–96:19. The Department thus argued that it could not permit Spector to work from home more than one day every two weeks because she lacked remote access to the required computer systems, authorization on those systems was outside the Department's control, and frequent access was necessary for Spector to do her job. Bonsack's Ltr. of Jun. 7, 2016, ECF No. 24-3 at 21–22. Spector disputed the Department's explanation for why state-level employees could not access Social Security systems remotely, pointing to Evans's and Cofino's access as proof that it was possible to provide remote entry. Pl.'s Ltr. of Jun. 17, 2016, ECF No. 24-3 at 25.

### B. FMLA Leave Request

Sensing that the negotiations were not progressing according to her expectations, Spector decided to take medical leave on the advice of her physician. Pl.'s Family and Medical Leave Application Form of May 13, 2016 ("FMLA App."), ECF No. 24-11 at 1–6. She simultaneously applied for short-term disability benefits through an existing insurance policy. *Id.* at 7. The Parties initially disputed how much of Spector's paid leave remained on balance and whether her leave request was properly construed under the Federal FMLA or D.C.'s analogous statute. Email Correspondence, ECF No. 24-11 at 15-17; Pl.'s Ltr. of Jun. 17, 2016, ECF No. 24-3 at 25–26; Mark D. Back's Ltr. of Jun. 29, 2016, ECF No. 24-3 at 28–29.

But the Department ultimately decided to deny the FMLA request for a different reason. The FMLA Application included the following question: "Is the employee unable to perform

any of his/her job functions due to the condition?" FMLA App. at 4. Spector answered "No." *Id.* Elsewhere on the application, she asserted several times that she was "able to perform the essential functions of [her] job with reasonable accommodation, but [her] employer [was] refusing to make one." *Id.* at 3. In its denial letter, the Department stated that "[b]oth the [D.C. Family and Medical Leave Act, D.C. Code § 32–503,] and federal FMLA leave programs require you to be unable to perform your duties due to a serious health condition. Based on your added statement, you are ineligible for both programs." Bonsack's Ltr of Jun. 15, 2016, ECF No. 24-11 at 22.

Nevertheless, Spector followed her physician's orders and stopped coming to work. Pl.'s Dep. 289:5–291:4. She exhausted her paid leave balance and then transitioned onto short-term disability benefits in June 2016. *Id.*; Nada Paisant's Email of Sep. 20, 2016, ECF No. 24-3 at 46–47. Spector remained away through the summer, but the Department did not declare her "absent without leave"—although it stopped paying her once she exhausted her accumulated hours of sick and vacation leave. Paisant's Email of Sep. 20, 2016, ECF No. 24-3 at 46–47.

### C. Position Reclassification

When the Department denied Spector's request for an accommodation for the second time in March 2016, it identified specific duties contained within her job description that were incompatible with telecommuting, namely that she was supposed to be out in the field daily, visiting, training, and evaluating medical providers throughout the city. Hernandez's Ltr. of Mar. 17, 2016, ECF No. 24-3 at 4. Spector objected, insisting that she performed such tasks rarely and that she spent most days in the office. Pl.'s Ltr. of Apr. 5, 2016, ECF No. 24-3 at 13–14. Spector's assertion that her position description was inaccurate then triggered an audit of the position to ensure that the description correctly stated Spector's duties. *See* Hernandez's Decl. ¶ 7, ECF No. 24-10.

While Spector was out on leave, the Department arranged for its reclassification specialist, Barbara Thompson, to audit Spector's job duties and position description. Barbara Thompson's Decl. ¶ 4, ECF No. 24-12. Although Thompson would normally have conducted a "desk audit" of the position by interviewing Spector personally, that was not feasible because Spector was absent from work. *Id.* Thompson instead performed a "supervisory audit," working with Spector's supervisor, Darryl Evans, to "determine the employee's duties." *Id.* Together they agreed on a revised description for the medical liaison officer position. *Id.* Once the draft description was in place, Thompson evaluated it under the federal Office of Personnel Management's Administrative Analysis Grade Evaluation Guide. *Id.* Under those standards, she concluded that the revised position ("Medical Professional Relations Officer"), which was previously classified at the CS-12 pay grade, only merited a CS-11 designation. *Id.* ¶¶ 4–5. The approved position description and pay-grade classification went into effect on October 3, 2016.[2] *Id.* ¶ 5.h.

### D.    Return to Work

While human resources officials and Spector's attorney were busy negotiating accommodations, Darryl Evans continued his efforts to obtain the Social Security Administration's permission for Spector to work remotely. Although Spector believed that both Evans and Cofino already possessed this type of access when she made her request for an accommodation, Evans's deposition testimony states otherwise. As Evans understood it (at least at the time of his deposition), both he and Cofino had remote access to the Department's various

---

[2] Thompson attributed the long delay between her evaluation of the position and the reclassification's final approval to her own backlog of tasks and various absences for vacation and medical treatment. Thompson Decl. ¶ 6. She also asserted that she was generally unaware of the ongoing accommodation dispute between Spector and the Department when she reclassified the position. *Id.* ¶ 2.

internal systems, such as their email accounts. Evans Dep. 78:1–80:22. But they neither needed nor possessed access to the secure federal database operated by Social Security—the same database at the center of the accommodation debate. *Id.* 38:13–20. So when Spector approached Evans about securing such access, he forwarded the request to Social Security. *Id.* 36:15–21. In response, Social Security enrolled the D.C. office in a nationwide pilot program designed to test the feasibility of permitting state employees to work remotely.[3] *Id.* 37:1–5. The D.C. office was one of only four chosen to participate. *Id.* Social Security granted preliminary approval in May, but Spector then had to go through a thorough security clearance examination to confirm her ability to remove sensitive equipment and documents from the office and maintain them in her home. *Id.* 98:1–21. By that time, however, she was on extended leave and was unavailable to begin the clearance process. *Id.* 98:20–99:1.

Spector also required approval from the D.C. government to telecommute. When she first made her request, there was no general telecommuting policy in place. *Id.* 95:17–96:19. In September, however, the D.C. government adopted a blanket policy permitting most employees to work remotely up to two days each week—the exact same arrangement Spector had been requesting all along. Email Correspondence, ECF No. 24-3 at 34–41; District of Columbia Human Resources, Electronic District Personnel Manual § 1211 (2016). Spector accepted the offer on September 12 and indicated her willingness to begin the Social Security Administration's background check process immediately. Pl.'s Email of Sep. 28, 2016, ECF No.

---

[3] The record suggests that the Social Security Administration may have adopted a telecommuting program for its federal employees as early as 2013. *See, e.g.*, Office of the Inspector General, Social Security Administration, *The Social Security Administration's Telework Program and Its Effect on Customer Service* (2017) ("SSA IG Report"), ECF No. 27-9. Evans's deposition testimony clarifies that this program did not include state-level employees, who seem to have become eligible for similar access only in 2016. Evans Dep. 97:8–12 ("[Spector] was the first person to be able to do that in our [state-level] world.").

24-3 at 42. That step was delayed for a few weeks while the Parties worked out related issues, but Spector started the background check on October 5. Evans's Email of Oct. 4, 2016, ECF No. 24-6. She returned to work on October 17. Back's Email of Oct. 14, 2016, ECF No. 24-7; Pl.'s Email of Oct. 18, 2016, ECF No. 24-8.

Further troubles soon arose. Upon her return, Spector learned that she had been demoted to the CS-11 pay grade. Pl.'s Dep. 313:7–16. She contested the reclassification and alleged that the new position description was itself inaccurate in that it failed to mention several of her prior responsibilities. *Id.* 315:17–322:13. The Department agreed to continue paying her at the CS-12 level for two years despite the reclassification so as not to cause her financial difficulty, but it declined to act on her objections to the new description. *Id.* 316:16–317:10.

Spector received a copy of her performance evaluation for Fiscal Year 2016 shortly after she came back to work. 2016 Performance Evaluation, ECF No. 24-16. Noting that Spector had missed several training events during her extended absence and that other people in the Department had taken over portions of her duties while she was gone, the review gave her an overall grade of 3.48/5.00—near the top of the range for classification as a "Valued Performer." *Id.* She objected to the results, pointing out that her evaluation for the previous year had scored her at 3.50. 2015 Performance Evaluation, ECF No. 24-15. While that may not seem like a major difference, the slightly higher score put her in the "Highly Effective Performer" category. *Id.* Spector amended her Equal Employment Opportunity Commission complaint to add a charge of retaliation for engaging in protected activity but continued working. EEOC "Right to Sue" Ltr. of Mar. 10, 2017, ECF No. 27-7.

Beyond the reclassification and the performance evaluation, Spector alleges that her supervisors isolated her, stopped communicating with her, and stopped assigning her work. Pl.'s

Dep. 320:17–22.  A year later in October 2017, Spector faced the prospect of going on another extended absence for maternity leave.  Rather than try to return to what she perceived as a hostile work environment, she resigned from her position.  *Id.* at 28:13–29:13.

Shortly thereafter, Spector filed this action.  *See generally* Compl., ECF No. 1.  As amended, the Complaint alleges six separate counts.  Count I charges disability discrimination and failure to accommodate under the Rehabilitation Act and the ADA.  Am. Compl. ¶¶ 67–73.  Count II alleges discrimination on the basis of sex under Title VII.  *Id.* ¶¶ 74–78.  Count III contends that the District retaliated against Spector for engaging in protected activity under the Rehabilitation Act, the ADA, and Title VII, including repeatedly requesting accommodations and filing complaints with the Equal Employment Opportunity Commission.  *Id.* ¶¶ 79–89.  Count IV alleges that the District created a hostile work environment in retaliation for the same protected activities.  *Id.* ¶¶ 90–99.  Finally, Spector brings two counts under the FMLA:  Count V, interference with protected leave, *id.* ¶¶ 100–108, and Count VI, retaliation for taking protected leave, *id.* ¶¶ 109–119.

The District moved for summary judgment on all counts.  *See generally* Mot.  In her opposition to summary judgment, Spector indicated her intent to dismiss Count II voluntarily and ceased pursuing any legal argument under Title VII, effectively dropping her claims of sex discrimination and retaliation.  *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 1 ("Opp'n"), ECF No. 27.  Although Spector failed to file a separate motion to dismiss the claim, the Court construes the statement in her Opposition as a motion under Federal Rule of Civil Procedure 41(a) and will dismiss Count II with prejudice.  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506–08 (D.C. Cir. 2016).

## II.    Legal Standard

Summary judgment is appropriate "if the [District] shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment on any count for which Spector "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for [Spector].'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "may not resolve genuine disputes" in the District's favor, *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and Spector's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor," *id.* at 651 (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. But if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of . . . summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    Analysis

The Court evaluates each count separately. Although several counts rely on the same statutes, each alleges slightly different violations and requires separate analysis.

### A.    Failure to Accommodate a Disability

Count I of the Amended Complaint alleges a denial of reasonable accommodations, a form of disability discrimination under both the Rehabilitation Act and the ADA. Am. Compl. ¶¶ 67–73. "The Rehabilitation Act provides that '[n]o otherwise qualified individual with a

disability' may 'be subjected to discrimination' by any federal agency 'solely by reason of her

. . . disability.'" *Mogenhan*, 613 F.3d at 1165 (quoting 29 U.S.C. § 794(e)). The Rehabilitation

Act incorporates the ADA's standards for disability discrimination. *Id.* (citing 29 U.S.C.

§ 794(d)). The ADA makes it unlawful to "discriminate against a qualified individual on the

basis of disability in regard to . . . the . . . advancement[] or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42

U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the

known physical . . . limitations of an otherwise qualified individual with a disability who is an

. . . employee" unless the employer "demonstrate[s] that the accommodation would impose an

undue hardship on the operation of the business." *Id.* § 12112(b)(5)(A).

To prevail on a reasonable accommodation claim, Spector must show that "(1) she was a

qualified individual with a disability, (2) the [employer] had notice of her disability[,] and (3) the

[employer] denied her request for a reasonable accommodation." *Ward v. McDonald*, 762 F.3d

24, 31 (D.C. Cir. 2014). Spector "bears the burden of proving these elements by a

preponderance of the evidence."[4] *Id.* The District concedes the first two prongs, so the only

issue is whether the agency denied the request for a reasonable accommodation. Mot. at 14–17.

Employers need not give employees the exact accommodations they request. *Ward*, 762

F.3d at 31. Instead, Equal Employment Opportunity Commission regulations envision that "it

may be necessary for the [employer] to initiate an informal, interactive process with the

individual" to "identify the precise limitations resulting from the disability and potential

---

[4] Reasonable-accommodation claims are "not subject to analysis under *McDonnell Douglas*" but
have "[their] own specialized legal standards." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288
(D.C. Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Barth v. Gelb*,
2 F.3d 1180, 1186 (D.C. Cir. 1993)).

reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). "The process contemplated is a 'flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'" *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).

Spector contends that the District "failed to engage with her in the interactive process." Opp'n at 9. She argues, first, that the District failed to negotiate with her in good faith, Opp'n at 9–12, and second, that the District unreasonably delayed in granting the accommodation. *Id.* at 12–19. The D.C. Circuit has sometimes discussed the concepts of bad faith and delay in separate terms. *See, e.g.*, *Ward*, 762 F.3d at 32 ("In sum, to establish that her request was 'denied,' [Plaintiff] must show either that the [employer] in fact ended the interactive process or that it participated in the process in bad faith."); *Mogenhan*, 613 F.3d at 1168 ("[T]here are certainly circumstances in which a 'long-delayed accommodation could be considered' unreasonable and hence 'actionable under the ADA.'" (quoting *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007), *abrogated on other grounds by Green v. Brennan*, 136 S. Ct. 1769 (2016))). But the two ideas are inherently linked in this case because they arise out of the same dispute: the length of time it took for the Department to grant Spector permission to work from home. *See Ward*, 762 F.3d at 32 ("'A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.'" (quoting *Sears*, 417 F.3d at 805)).

"There is no independent cause of action for failure to engage in the interactive process—under the ADA and in turn, the Rehabilitation Act, there is only a cause of action for failure to accommodate generally." *Doak v. Johnson*, 19 F. Supp. 3d 259, 278 n.20 (D.D.C.

2014).  In the typical case, one party or the other walks away from the table and refuses to

negotiate, causing a breakdown in communications and a failure to make the appropriate

accommodation.  *Ward*, 762 F.3d at 32.  In those cases,

> courts should look for signs of failure to participate in good faith or
> failure by one of the parties to make reasonable efforts to help the
> other party determine what specific accommodations are necessary.
> A party that obstructs or delays the interactive process is not acting
> in good faith.  A party that fails to communicate, by way of
> initiations or response, may also be acting in bad faith.  In essence,
> courts should attempt to isolate the cause of the breakdown and then
> assign responsibility.

*Id.* (quoting *Sears*, 417 F.3d at 805).  For example, in *Ward*, the plaintiff made her request for an

accommodation in March.  *Id.* at 29.  The parties met several times and traded requests for

information and medical documentation over the following three months, but the plaintiff

resigned in June after becoming frustrated with the process.  *Id.* at 29–30.  The court determined

that the employer adequately participated in the interactive process and upheld summary

judgment in its favor.  *Id.* at 32–33.

The *Ward* court also approvingly cited *Beck v. University of Wisconsin Board of Regents*,

75 F.3d 1130 (7th Cir. 1996).  There, a secretary requested various minor accommodations for

arthritis and other medical problems.  *Id.* at 1132–33.  The employer sought more information

and provided various fixes, but the plaintiff was unsatisfied and went to court.  *Id.* at 1133.  The

Seventh Circuit upheld summary judgment for the employer because "[a]t no point did the

University fail to respond in some manner to Beck's requests for accommodation, and there

[was] nothing in the record from which [the Court could] discern any attempt by the University

to sweep the problem under the rug."  *Id.* at 1136.

The panel in *Ward* contrasted *Beck* and other cases with ones from other circuits in which

employers did not demonstrate sufficient good-faith negotiation to warrant summary judgment.

*See, e.g.*, *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952–53 (10th Cir. 1999) (finding bad faith where employer "placed [employee seeking disability accommodations] on a sixty-day performance plan, terminated her on day forty-seven . . . [for] fail[ing] to meet the performance expectations outlined in the plan, and never offered her reassignment or discussed whether other accommodations were available"); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (en banc) ("The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome."); *Sears*, 417 F.3d at 807 ("Sears was not obligated to provide this accommodation, but it also could not simply reject the request and take no further action. A reasonable jury could conclude, however, that this is exactly what happened.").

It is undisputed that some form of negotiation occurred here. The record contains ample documentation of various communications between the Parties beginning in March 2016, when Spector submitted her request for an accommodation, Pl.'s Email of Mar. 7, 2016, ECF No. 27-4 at 4, until Spector returned to work approximately seven months later, Pl.'s Email of Oct. 18, 2016, ECF No. 24-8. Spector retained two different attorneys during that time to negotiate on her behalf. Pl.'s Ltr. of Mar. 14, 2016, ECF No. 24-3 at 2–3; Pl.'s Ltr. of Jun. 17, 2016, ECF No. 24-3 at 23–27. The Parties met face-to-face (with counsel and union representation in attendance) in early April, Email Correspondence, ECF No. 24-3 at 14–17, and the attorneys continued to trade letters throughout the summer, *id.* at 21–33. Those communications culminated in settlement negotiations throughout the month of September. *Id.* at 34–52.

But Spector contends that the District used the process as a delaying tactic, negotiating in bad faith without a genuine intent to accommodate her disability. Opp'n at 9–12, 15–19. She

first points to the District's summary denial of her request for an accommodation only two days after she submitted it. Hernandez's Ltr. of Mar. 9, 2016, ECF No. 24-3 at 1. She also argues that the District's shifting rationales for denying her accommodation were mere pretext rather than legitimate bases for negotiating a mutually agreeable solution. Opp'n at 10. She points to at least seven different justifications the District offered for denying her request: (1) insufficient supporting medical documentation, Hernandez's Ltr. of Mar. 9, 2016, ECF No. 24-3 at 1; (2) inconsistency with her existing job description, Hernandez's Ltr. of Mar. 17, 2016, ECF No. 24-3 at 4; (3) the lack of an approved telework policy in her agency, Hernandez Dep. 50:9–12, ECF No. 27-3; (4) the notion that Spector did not "want[] to do the work," *id.* 51:13–14; (5) the idea that Spector unreasonably wanted to be able to telecommute at her discretion rather than on a defined schedule, *id.* 128:8–15; (6) the suggestion that Spector wanted to work from home every day of the week, *id.* 104:13–15; and (7) the need to audit Spector's position description before permitting any accommodation to go into effect, Pl.'s Dep. 195:19–21, ECF No. 27-3.

The District responds that Spector received the precise accommodation she sought, and that its various grounds for bargaining with her arose out of legitimate concerns regarding the need to balance Spector's request with the agency's responsibilities. Mot. at 14–17. The District addresses each allegation of bad faith and points to evidence in the record showing that it had valid reasons for raising each point during the course of bargaining. *Id.* Moreover, it only took seven months to reach an accord and complete the administrative hurdles required to permit Spector to work from home. *Id.* (citing *Leiterman v. Johnson*, 60 F. Supp. 3d 166, 181 (D.D.C. 2014) (rejecting summary judgment on the question of whether a three-year delay was unreasonable) (other citations omitted)).

But even if the undisputed facts were so one-sided as to preclude a reasonable jury from finding that the District acted in good faith or unreasonably delayed, there is at least one genuine dispute of material fact that precludes summary judgment on this count.  One of the reasons the Department gave for delaying the accommodation was that Spector needed to be able to access a secure Social Security database from home, which the Department contended was an impossibility.  Bonsack's Ltr. of June 7, 2016, ECF No. 24-3 at 21 ("There are also security limitations which prevent you from accessing the Social Security Administration's online network remotely.").  In the District's explanation, although the Social Security Administration may have permitted its own employees to telecommute earlier than 2016, *see generally* SSA IG Report, it did not permit state-agency employees the same access until the summer of 2016.  Evans Dep. 102:3–22.  According to the District, Evans made the request to Social Security on Spector's behalf, and Social Security started a pilot program to test out the initiative.  *Id.* 36:15–21, 38:13–20.  As Evans put it, Spector was "the first person to be able to do that in our [state-level] world."  *Id.* 97:11–12.  Evans acknowledged that he and Cofino had devices to enable them to do some remote work but stated that those devices did not permit them access to the protected federal databases—a critical function of Spector's work.  *Id.* 38:17–20 ("I have a BlackBerry that I have carried for a number of years because I'm essential personnel.  That does not allow me to get into [Social Security Administration] systems which are critical to [her] work.").  If that is true, then perhaps no reasonable jury could conclude that the delay in permitting Spector access to the system was unreasonable.

Spector strongly denies that characterization.  *See* Opp'n at 15–17.  She alleges that both Evans and Cofino had the ability to access the Social Security Administration's systems remotely in March 2016.  *See* Pl.'s Dep. 119:15–20 ("The people in the offices next to me,

Darryl Evans and . . . Roberto Cofino, both have laptops. I would see them in their office all the time as I was being told it was a security issue for me to have one."). Evans's deposition testimony counters those points, *see* Evans Dep. 95:12–96:19, and based on his seniority and intimate knowledge of the program details, a reasonable jury might not be able to conclude that Spector's understanding of the technological problems was accurate.

But the District, for its part, has endorsed *both* Spector's *and* Evans's understandings of the problem, despite the fact that the two characterizations run contrary to one another. Responding to Spector's complaint before the Commission, the District made the same argument it makes now: "[Spector] works in a secure building, on a secure computer, and handles personal and confidential information. . . . Thus, even with the accommodation . . . offered to [her], the only functions that she could perform at home would be clerical and administrative—i.e.[,] checking and responding to emails." Resp. Agency's Position Statement, ECF No. 27-5 at 18. The District appended a declaration by Deborah Bonsack, who repeated the same argument. *See* Bonsack Decl. ¶ 4, ECF 27-5 at 27 ("In addition, at the time of her request, the Social Security Administration . . . limited the ability of [Disability Determination Division] employees to have remote access to the [federal] data base [sic] . . . that was essential to the work of the [Division] and to the Medical Liaison Officer position."). But later in her declaration, Bonsack affirmed that both Evans and Cofino *"[had] been provided off-site access by [the Social Security Administration] to the data base [sic]"* because "the nature of their jobs at times required that they perform duties outside of regular work hours as requested by [Social Security]." *Id.* ¶ 6 (emphasis added). Those responsibilities arose out of a "[Social Security] requirement for [those] two critical positions to have data base [sic] access" and was common to "these positions across jurisdictions throughout the country." *Id.* In other words, contrary to Evans's deposition

testimony, the District expressly represented to the Equal Employment Opportunity Commission that Evans and Cofino had remote federal database access and that supervisors and IT specialists in every state had the same privileges.

If that is the case—and the Court is certainly not in a position to decide one way or the other—then a reasonable jury might well conclude that the District's repeated insistence that federal policy precluded Spector from telecommuting was a pretext to avoid granting her requested accommodation.  "[T]here are certainly circumstances in which a long-delayed accommodation could be considered unreasonable and hence actionable" under the ADA. *Mogenhan*, 613 F.3d at 1168 (internal quotation omitted).  "In determining whether a particular delay is unreasonable, courts look to factors such as 'the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith.'"  *Matos v. DeVos*, 317 F. Supp. 3d 489, 499 (D.D.C. 2018) (quoting *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1262–63 (10th Cir. 2001)).

According to the District, it took about five months to work out an acceptable accommodation, which included having the Department change its telecommuting policy altogether *and* getting approval from a federal agency to make an exception for Spector.  In its view, that is well within what is reasonable, and that is likely true if there was actually a federal policy impediment to Spector telecommuting.  *See* Mot. at 16 (citing *Clayborne v. Potter*, 448 F. Supp. 2d 185, 192–93 (D.D.C. 2006) ("This course of events demonstrates that [the employer] acted reasonably and in good faith in accommodating [Plaintiff's] disability.  This process simply took a year."); *Matos*, 317 F. Supp. 3d at 499 (holding that two years was not unreasonably long when the plaintiff refused to negotiate for the first year and the employer

eventually obtained the agreed-upon accommodation within five months (other citations omitted))).

But the question here turns at least in part on whether the District acted promptly to arrange a remote work option upon Spector's request (and was impeded by circumstances outside its control) or whether the District dragged its feet in an effort to force Spector to give up—a position that finds some potential support in the District's statements to the Equal Employment Opportunity Commission. The record before the Court does not so obviously answer that question as to make summary judgment appropriate. This case is more analogous to *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37 (D.D.C. 2012), where genuine disputes precluded summary judgment because although the employer ultimately made several accommodations, it took two or three years for the process to work itself out, and there was some backsliding after the first accommodations went into effect. *Id.* at 59. The Court therefore denies summary judgment on Count I.

## B.  ADA and Rehabilitation Act Retaliation

Count III of the Amended Complaint alleges that the District retaliated against Spector because she attempted to exercise her rights under the Rehabilitation Act and the ADA.[5]  Am. Compl. ¶¶ 79–89. In addition to requiring employers to make reasonable accommodations for employees' disabilities, the ADA also has an anti-retaliation provision making it unlawful to

---

[5] The Amended Complaint also grounds the retaliation claim in Title VII by alleging that Spector suffered reprisal as a result of complaining of sex discrimination to the Equal Employment Opportunity Commission. Am. Compl. ¶ 80. Because Spector has dropped her corresponding discrimination claim under Title VII and has put forward no evidence or argument that the District retaliated against her for activities protected by Title VII, the Court confines its analysis of the alleged retaliation to the disability discrimination context. As with disability discrimination, the Retaliation Act incorporates the ADA's prohibition of and standards for evaluating retaliation. 29 U.S.C. § 794(d).

"discriminate against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). The "substantive [discrimination] provision and [the] antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 67 (2006). The standard for evaluating discrimination in the ADA context is the same as it is under Title VII: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

The burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), applies to ADA and Rehabilitation Act retaliation claims. *Durant v. D.C. Gov't*, 875 F.3d 685, 696–97 (D.C. Cir. 2017); *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 & n.2 (D.C. Cir. 2008). To establish a prima facie case of retaliation, a plaintiff must show that "(1) [she] engaged in activity protected by [the ADA]; (2) the employer took an adverse employment action against [her]; and (3) the adverse action was causally related to the exercise of [her] rights." *Durant*, 875 F.3d at 696–97 (internal quotation omitted). If she can make such a showing, she shifts the burden to the District to rebut a presumption of retaliation by "provid[ing] a legitimate, nonretaliatory reason for its action." *Id.* at 697. If the District is successful, "the burden-shifting framework disappears and the question becomes whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Id.* (internal quotations omitted).

Spector alleges that she engaged in protected activity when she (1) requested an accommodation, (2) filed her Equal Employment Opportunity Commission complaint, and (3) requested FMLA leave. Am. Compl. ¶¶ 81–83. The District concedes that these are all protected activities. Mot. at 20. But it disputes that Spector has satisfied the second and third prongs of the test: that the District committed any adverse actions against her or that there was any causal link between the protected activities and the allegedly adverse actions. *Id.* Those activities include (1) delaying in granting Spector a Social Security laptop to enable remote work, (2) reclassifying her job (thereby demoting her) and isolating her from the rest of the office, and (3) issuing her a negative performance evaluation. Am. Compl. ¶¶ 84–86.

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67. The harm must be material, because "it is important to separate significant from trivial harms." *Id.* at 68. To be material, the consequences cannot consist of "petty slights and minor annoyances," "minor inconveniences and alteration of job responsibilities," or "evaluations and written warnings" that have no "tangible job consequences." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (internal quotations and citations omitted). Instead, the consequences must be "objectively tangible" and come with demonstrable harms. *Id.*

*Laptop Delay*. Spector first argues that the laptop delay "had a tangible impact on her employment because it precluded her from working for eight months, forcing [her] to remain in [a] leave without pay status." Opp'n at 21. The District responds that Spector has "no evidence this delay tangibly affected her employment," pointing primarily to the fact that Spector resumed employment once she returned from leave and obtained the laptop. Mot. at 23. But the District ignores the several weeks during which Spector went without pay while waiting for approval to

begin teleworking and receiving the necessary equipment. Under Spector's theory, the District continued to deny her the use of a laptop because she filed an Equal Employment Opportunity Commission complaint. Opp'n at 20–21. That caused her to take unwanted leave on the advice of her physician, who believed that her medical condition precluded her from working in the office every day of the week. *Id.*; *see also* Pl.'s Dep. 90:10–16, ECF No. 27-3 ("[I took leave b]ecause my employer would not provide a reasonable accommodation, and it was taking a toll on my health, a very negative toll. My doctor . . . told me I would not be returning to my employer until they were willing to provide a reasonable accommodation."). Moreover, the continued delay caused Spector to exhaust her available leave balance, thereby forcing her to go on unpaid leave and use her short-term disability benefits. Opp'n at 20–21; *see also* Pl.'s Dep. 290:20–291:20 (explaining use of leave balances and short-term disability benefits).

The claimed delay in granting Spector's request may be a "tangible job consequence" that is actionable under a theory of illegal retaliation, at least when taking into the account the foreseeable possibility that Spector would not be able to continue working. *Taylor*, 571 F.3d at 1321. To be sure, "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation omitted). Materially adverse actions usually involve "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). But "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington N.*, 548 U.S. at 69.

This is a close call, because Spector was not placed on leave against her will—she stayed home on her doctor's orders. *See* Paisant's Email of Sep. 30, 2016 at 2, ECF No. 24-3 at 51

("Likewise, the Agency has no opposition to having Ms. Spector return to work. It has been Ms. Spector's choice not to return to work, therefore, it remains her choice should we not reach an agreement."). But the D.C. Circuit has recognized that an employee's decision to take unpaid leave when the employer has made it impossible to function appropriately in the office can constitute an adverse employment action. *Greer v. Paulson*, 505 F.3d 1306, 1314 (D.C. Cir. 2007). "[T]here should be no reward for an employer 'who sought to rid [the worksite]' of certain employees on the basis of [disability], by driving them to take leave, or otherwise escape from the workplace." *Id.* (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)). That may be true even if the employer later provides backpay for the lost time, because the lost cash flow can cause serious financial hardship. *Id.* at 1317–18 (*citing Burlington N.*, 548 U.S. at 71–72). And there is at least some evidence in the record that the District did just that. As set forth above, at least some evidence suggests that the District could have issued Spector a laptop and permit her to telecommute from the outset of the negotiations. *See supra* Section III.A. And Spector has proffered evidence of financial hardship resulting from the lack of pay and mounting legal costs she incurred while negotiating an accommodation. *See* Adam Spector's Decl. ¶¶ 6–7, ECF No. 27-11. Because the District has not carried its burden of proof to show that the delay was due to a non-pretextual reason, *see supra* Section III.A, it cannot obtain summary judgment on this issue under *McDonnell Douglas*. 411 U.S. at 802–03.

*Job Reclassification.* A downward reclassification (here, from CS-12 to CS-11) is typically a prima facie adverse action. *See Baloch*, 550 F.3d at 1196 ("[A]n adverse employment action [can] entail a loss of salary, grade level, or benefits"); *see also Ellerth*, 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits.").  The District responds that there is no evidence that Spector suffered tangible harms from the reclassification—after all, the agency agreed to maintain her salary at the CS-12 level for two years after the reclassification, and she left her job only one year later.  *See* Mot. at 21–22 (citing  Pl.'s Dep. 319:11–320:22, 321:114).  Although Spector contends that she would have suffered a future reduction in salary had she remained in her job for the full two-year period, the District points out that event never occurred, and so Spector never experienced any threatened harm.  *Id.*

But that argument misapprehends the low bar *Burlington Northern* established for retaliation.  While a demotion is usually "evidenced by a decrease in wage or salary," *Ellerth*, 524 U.S. at 761 (internal quotation omitted), tangible employment actions might also include "firing, failing to promote, reassignment with significantly different responsibilities, or . . . a significant change in benefits," *id.*   In *Burlington Northern*, the Court recognized that even seemingly trivial actions divorced from any automatic financial harm might still qualify as materially adverse based on context.  548 U.S. at 67–73.  The Court observed, for example, that "[a] supervisor's refusal to invite an employee to lunch is normally trivial, . . . [b]ut to retaliate by excluding an employee for a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."  *Id.* at 69.  In that case, the Court concluded that reassigning an employee from preferable duties as a forklift operator to less desirable work as a track laborer, *even without a change in salary, job title, or benefits*, could be considered a materially adverse, retaliatory action. *Id.* at 71.

"Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the

plaintiff's position, considering all the circumstances." *Id.* (internal quotation omitted). Spector alleges that the District demoted her, changed her title, and altered her job responsibilities. Pl.'s Dep. 319:11–320:2. Moreover, she claims that once she returned to work (with a lower pay grade and a new job description), her supervisors and coworkers isolated her by failing to invite her to meetings, leaving her off of group emails, and refusing to communicate with her. *See id.* 363:16–366:4. Taken together, a reasonable jury could conclude that such actions would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (internal quotation omitted).

The District further argues that, even if the actions might be materially adverse, Spector fails to demonstrate a causal link between her protected activities and the job reclassification. Mot. at 22. It argues that because the Department outsourced the question of Spector's position description to Barbara Thompson (who, though a District employee, was neither involved in nor aware of Spector's disability or request for accommodation), no reasonable jury could attribute the results of the reclassification project to any supervisor's desire to retaliate against Spector. *Id.* (citing Thompson Decl. ¶ 2). But the District's argument ignores the methods Thompson used to gather data about Spector's duties, namely interviewing Thompson's supervisor, Evans, to develop a list of Spector's actual responsibilities. Thompson Decl.¶¶ 4, 5.a. There is no question that Evans was deeply involved in the accommodation process, so a reasonable jury could find that Spector's supervisors had the ability to influence the reclassification process despite Thompson's seeming independence.

The District also contends that the seven-month period between Spector's complaint to the Equal Employment Opportunity Commission and the reclassification of her position defeat any inference of a causal link between the two. Mot. at 22 (citing *Greer v. Bd. of Tr. of Univ. of*

*D.C.*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015) ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit.") (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012))). To be sure, a long delay between protected activities and adverse employment actions can defeat any inference of causation. *Holcomb v. Powell*, 433 F.3d 889, 902–03 (D.C. Cir. 2006). But here Thompson began work on the project (at Evans's request) less than a month after Spector filed her complaint in March 2016. Thompson Decl. ¶ 5.a. Thompson attributed the long delay between beginning her assessment and completing the reclassification to a backlog of work on her end, not to any action by Department officials. *Id.* ¶ 6. A reasonable jury could therefore conclude that the District retaliated against Spector by ordering an audit of her job duties and pay grade less than a month after she engaged in protected activity, so summary judgment is not appropriate.

*Performance Evaluation.* Finally, "[i]n order for a performance evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Taylor*, 571 F.3d at 1321 (quoting *Baloch*, 550 F.3d at 1199). Here there is no evidence of any tangible harm resulting from her 2016 performance evaluation. On a 5.0 scale, Spector's evaluation dropped from a 3.5 in 2015 (before the request for accommodation) to a 3.48 in 2016 (after Spector's return to work). *Compare* 2015 Performance Evaluation, *with* 2016 Performance Evaluation. That slight difference was enough to drop her into a lower performance category ("valued performer" rather than "highly effective performer"), but the record is devoid of any consequences flowing from that change. Spector alleges that she was unable to obtain subsequent employment because of the evaluation. Opp'n 21; Pl.'s Dep. 29:18–31:22. But as in *Taylor*, Spector's "bare, conclusory allegation that she was denied [employment

opportunities] . . . does not discharge her burden to show the evaluation[ was] attached to financial harms."  571 F.3d at 238 (internal quotations omitted).  There is simply nothing in the record linking Spector's performance evaluation to diminished employment opportunities, so she cannot demonstrate that the evaluation was materially adverse.

In sum, because Spector does not identify objective harms resulting from the negative performance evaluation, she has not made a prima facie case of discriminatory retaliation on that issue.  A reasonable jury could, however, find that the District intentionally delayed in issuing Spector a laptop and approving her telecommuting request, thereby foreseeably forcing her to remain away from work for weeks or months and incurring a financial hardship.  A jury could also find that the District retaliated against Spector by reclassifying her position, demoting her by one pay grade (even without a corresponding change in salary), changing her job duties, and ostracizing her within the workplace.  Summary judgment is therefore not appropriate for the District on Count III.

## C.    Hostile Work Environment

Beyond the specific actions the District allegedly took to retaliate against Spector discussed above, Count IV of the Amended Complaint alleges that the District also retaliated against her by fostering a hostile work environment.  Am. Compl. ¶¶ 90–99.  To prevail on such a claim, Spector "must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of the [her] employment and create an abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  In identifying the actions she alleges constituted abuse, Spector repeats the behavior underlying her other claims:  the delay in granting her accommodation, the shifting justifications, the FMLA denial, the reclassification of her position to a lower pay grade, the performance evaluation, the agency's refusal to consider

her requests for further amendments to her position description upon her return, isolating her from her colleagues, and failing to invite her to meetings or to task her with assignments. Opp'n at 25. She also adds to that list Deborah Bonsack's mocking comment. *Id.* But even if all those allegations are true, they do not support liability for a hostile work environment.

"To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Sporadic incidents of rude or unprofessional behavior are not enough—severe or pervasive means just that. *Barbour v. Browner*, 181 F.3d 1342, 1348–49 (D.C. Cir. 1999) (insulting gesture from a colleague and a supervisor's intentionally slow response to employee's question were insufficient to support a finding of hostile work environment); *see also Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir. 2006) (denied promotion, lower performance evaluations, demotion, and reduced autonomy insufficient); *Baloch*, 550 F.3d at 1201 (demanding medical documentation for all sick leave, threatening suspension, issuing letter of reprimand and unsatisfactory performance review, and "profanity-laden yelling" insufficient). When allegations survive summary judgment, the abuse is usually quite severe. *See, e.g.*, *Singletary v. District of Columbia*, 351 F.3d 519, 528–29 (D.C. Cir. 2003) (failure to promote, failure to provide necessary tools, relegation to an unheated and poorly lit storage room for a year and a half despite available office space, failure to create a job description and then measuring plaintiff's performance against arbitrary standards for six years *may* be sufficient); *Barbour*, 181 F.3d at 1348 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) (repeated sexual assault enough)).

While the actions here may have been boorish or in poor taste, or otherwise unlawful, Spector cites to no analogous cases to support her contention that the conditions she faced were so "extreme [as] to amount to a change in the terms and conditions of [her] employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Summary judgment for the District is appropriate on Count IV.

### D.    FMLA Interference

Count V alleges that the District interfered with Spector's right to take protected medical leave under the Family and Medical Leave Act. Am. Compl. ¶¶ 100–108. The federal version of the statute entitles employees to twelve weeks of unpaid leave during a twelve-month period for a "serious health condition that makes the employee unable to perform the functions of the positions of such employee." 29 U.S.C. § 2612(a)(1)(D). The District of Columbia's FMLA gives a similar entitlement of 16 weeks of leave during any twenty-four-month period for the same reason. D.C. Code § 32–503(a). The federal statute prohibits both interference with an entitlement and retaliation,  29 U.S.C. § 2615, and creates a private right of action making employers liable for lost compensation and other financial losses, *id.* § 2617(a).

To survive summary judgment on her interference claim, Spector must show that "(1) she had a serious health condition; (2) her condition rendered her unable to perform the functions of her job; (3) she gave her employer reasonable notice of her need to take leave and the reasons for doing so; (4) the employer wrongfully denied the leave; and (5) plaintiff suffered a legal injury as a result of the denial."[6]  *Thomas v. District of Columbia*, 197 F. Supp. 3d 100, 107 (D.D.C.

---

[6] There is no D.C. Circuit precedent on this issue, so district courts use variations on this test. *See, e.g.*, *Elzeneiny v. District of Columbia*, 195 F. Supp. 3d 207, 217 (D.D.C. 2016) (requiring a plaintiff to show "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient

2016).  The agency disputes that Spector meets the second and fifth prongs but concedes the others.  Mot. at 18–19.

First, it argues that Spector herself indicated that she was able to perform the functions of her job, so she was clearly not entitled to FMLA leave.  *Id.* at 19.  In particular, when Spector filled out the appropriate leave request form, she indicated that she was requesting leave due to her "personal health condition" but further wrote that she was "able to perform the essential functions of [her] job with reasonable accommodation, but [her] employer [was] refusing to make one."  FMLA App. at 1–3.  From that evidence alone, the agency denied the leave request because Spector declared herself ineligible for FMLA protection.  Bonsack's Ltr. of Jun. 15, 2016, ECF No. 24-11 at 22.

The District's argument, presented again here, doesn't hold water.  It rests on a narrow reading of the checkboxes on the request forms and ignores the context.  The documentation from Spector's physician attached to the request form clearly indicates that Spector could not perform the essential functions of her job without accommodations, which did not exist at the time.  FMLA App. at 4–6.  A jury could easily infer from the evidence that Spector was "unable to perform the functions of her job" when she requested FMLA and was therefore eligible for medical leave.  *See Thomas*, 197 F. Supp. 3d at 107–08 (rejecting employer's argument that employee was able to work part-time and therefore able to perform the essential functions of her job because physician's notes indicated that employee would be unable to work during the duration of treatment and would therefore at least temporarily be eligible for FMLA).

---

notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." (quoting *Pagel v. TIN Inc.*, 695 F.3d 622, 627 (7th Cir. 2012))).

The District's second argument carries more weight. It contends that, even assuming Spector was qualified for and improperly denied FMLA leave, she suffered no injury from the denial because the District never terminated her employment, declared her absent without leave, or took any administrative action to discipline her for her absence. Mot. at 19. To demonstrate harm resulting from the interference, Spector must show either "(1) loss of compensation or benefits, (2) other actual monetary harm, or (3) remediable loss in employment status." *Roseboro v. Billington*, 606 F. Supp. 2d 104, 112 (D.D.C. 2009) (citing 29 U.S.C. § 2617(a)). Spector alleges that she was harmed by (1) being forced to use accrued sick and vacation leave rather than FMLA leave (until she exhausted it and went on short-term disability); (2) being forced to increase treatment by her psychiatrist due to emotional damages from the denial; (3) being unable to accrue leave and retirement benefits during her absence; and (4) a negative performance evaluation specifically citing her absence as the reason for the lower score. Opp'n at 27–28.

These claimed harms are insufficient to survive summary judgment. Although the District denied Spector protected FMLA status while she was away from work during the summer of 2016, she suffered no prejudice from that denial. The FMLA does not provide for paid leave; it merely prevents an employer from firing an employee. *See Roseboro*, 606 F. Supp. 2d at 112 ("First, while Roseboro was wrongfully denied the twelve weeks of FMLA leave, he took that twelve weeks of leave anyway. Accordingly, he cannot claim to have lost the benefit. Additionally, Roseboro would not be entitled to any back pay for leave that was not properly recognized as FMLA leave, as FMLA leave is unpaid. The error caused Roseboro no loss of compensation."). Moreover, Spector was compensated during her paid leave time, so she received a benefit she would otherwise not have received while out on FMLA. Pl.'s Dep.

288:11–289:12; *see also Lovely-Coley v. District of Columbia*, 255 F. Supp. 3d 1, 12 (D.D.C. 2017) ("[T]he plaintiff has failed to show that she was prejudiced by the District's alleged interference that caused her to suffer a loss in either benefits or compensation [because by] taking her personal sick and annual leave balance . . . , the plaintiff received monetary compensation for her leave. Had she taken FMLA leave, . . . the plaintiff would not have received any compensation."). If the District had granted FMLA leave, Spector would have been out of the office for the same amount of time, would not have received any compensation, and would have returned to work in the same manner. The use of sick leave and vacation time in lieu of FMLA leave do not constitute harm resulting from any illegal interference.

Moreover, damages for emotional distress are not cognizable under the FMLA. *Lovely-Coley v. District of Columbia*, 191 F. Supp. 3d 20, 25 n.6 (D.D.C. 2016) (citing *Rodgers v. City of Des Moines*, 435 F.3d 904, 909 (8th Cir. 2006)), *vacated on other grounds upon reconsideration*, 255 F. Supp. 3d 1 (2017); *see also Farrell v. Tri-County Metro. Transp. Dist. of Or.*, 530 F.3d 1023, 1025 (9th Cir. 2008) (collecting cases).

As to Spector's third claim—that she was placed in an administrative leave status and thus failed to accrue leave and benefits during her absence—such effects might be sufficient to pursue an FMLA claim, but there is simply no evidence in the record regarding this issue; the only details about Spector's leave accrual come from a passing allegation in her Opposition to the District's Motion for Summary Judgment. Opp'n at 27. This claim is therefore unsupported by the record and cannot create a genuine fact dispute sufficient to overcome summary judgment.

Finally, Spector argues that the negative performance evaluation constitutes a "loss in employment status" sufficient to demonstrate harm from the District's denial of FMLA leave.

Opp'n at 27. She points to language in the text of the evaluation that brazenly faults her for her extended absence:

> Nicole did miss out on some [Social Security Administration] specific training for [Medical Professional Relations Officers] which had an impact on our office as well. Additionally, Nicole missed some mandatory trainings through the parent agency which may have been helpful to Nicole in her public relations accountabilities. Finally, Nicole missed [the Social Security Administration's] mandatory Security Awareness and Fraud Trainings which have been recorded and documented at the [federal] level.

2016 Performance Evaluation at 2; *see also id.* at 3–5. But as the Court has already noted, the evaluation does not qualify as an adverse employment action because Spector can demonstrate no financial harm flowing from it. *See supra* Section III.B.

Although the District denied FMLA leave on questionable grounds, it permitted Spector to take an extended absence without additional financial consequence. The undisputed evidence fails to support a claim for FMLA Interference, so summary judgment on Count V is appropriate for the District of Columbia.

### E.  FMLA Retaliation

Count VI alleges that the District reclassified Spector's position and gave her the lower performance evaluation in part as retaliation for her request to take FMLA leave. Am. Compl. ¶¶ 109–19. But after discovery, Spector added additional factual bases to sustain the claim, including the temporary denial of a laptop. Opp'n at 29. As stated above, the FMLA prohibits employers from taking "adverse action[s] against the employee because the employee took leave or otherwise engaged in activity protected by the [FMLA]." *Roseboro*, 606 F. Supp. 2d. at 108. For the same reasons that summary judgment is not appropriate for her ADA and Rehabilitation Act retaliation claim, it is also inappropriate for FMLA retaliation: a reasonable jury could find that the District delayed for months in issuing a laptop and telework authorization and then

demoted her in retaliation for exercising her FMLA rights. *See supra* Section III.B. Here, Count VI merely adds an additional legal theory for pursuing the retaliation claims already encompassed under Count II. The record contains genuine disputes on those facts, so summary judgment is not appropriate on Count VI.

## IV.     Conclusion

The undisputed evidence before the Court entitles the District of Columbia to summary judgment on Spector's claims of hostile work environment and FMLA interference. But genuine disputes of material fact preclude summary judgment on the question of whether the District failed to accommodate Spector's disability adequately, and whether the District subsequently retaliated against her for activities protected under the Rehabilitation Act and the FMLA.

For the foregoing reasons, the District of Columbia's Motion for Summary Judgment is **DENIED** as to Counts I, III, and VI and **GRANTED** as to Counts IV and V. Count II is **DISMISSED** with prejudice. An Order will be entered contemporaneously with this Memorandum Opinion.

DATE: February 28, 2020

_____
CARL J. NICHOLS
United States District Judge